**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| EMMANUEL DUNAGAN, JESSICA MUSCARI, ROBERT J. INFUSINO, and STEPHANIE PORRECA, on behalf of themselves and a class of similarly situated persons, <br><br><br> Plaintiffs, <br><br> v. <br><br><br> ILLINOIS INSTITUTE OF ART-SCHAUMBURG, LLC, an Arizona limited liability company; ILLINOIS INSTITUTE OF ART, LLC, an Arizona limited liability company; DREAM CENTER FOUNDATION, a California non-profit corporation; DREAM CENTER EDUCATIONAL HOLDINGS, LLC, an Arizona limited liability company; and JOHN DOES 1-10, in their individual capacity, <br><br> Defendants. | Case No. 19-cv-809 <br><br><br><br><br><br><br><br><br><br> SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND |

**<u>SECOND AMENDED CLASS ACTION COMPLAINT</u>**

1.      Plaintiffs Emmanuel Dunagan, Jessica Muscari, Robert J. Infusino, and Stephanie Porreca ("Named Plaintiffs"), on behalf of themselves and a class of similarly situated persons, bring this class action complaint against the Dream Center Foundation ("DCF"), Dream Center Education Holdings, LLC ("DCEH"), the Illinois Institute of Art, LLC ("IIA"), the Illinois Institute of Art-Schaumburg, LLC ("IIA-Schaumburg"), and John Does 1-10, in their individual capacity (collectively, "Defendants") for violations of the Illinois Consumer Fraud and

Deceptive Practices Act, 815 ILCS 505/2 ("ICFDPA"), fraudulent concealment, and negligent misrepresentation.

## **NATURE OF THE CASE**

2.     Defendant IIA was an institution of higher education in operation since 1916, comprised of campuses in Schaumburg, IL ("IIA-Schaumburg"), Chicago, IL ("IIA-Chicago"), and Novi, MI.  IIA offered bachelor's and associate degrees for several programs, including culinary arts, design, fashion, and media arts.  IIA closed in December 2018.

3.     On March 3, 2017, Defendant DCF entered into an agreement to purchase IIA from its then-owner, Education Management Corporation ("EDMC").  At the time of the purchase IIA, and all its campuses, were accredited by the Higher Learning Commission ("HLC"), a private, non-profit accrediting agency recognized by the United States Department of Education ("Department").

4.     On January 20, 2018, the change in ownership and control of IIA schools from EDMC to DCF and its subsidiaries became effective.

5.     The change in ownership and control to DCF caused HLC to remove IIA's status as an accredited institution of higher education.

6.     Defendants did not inform IIA students at any time after agreeing to purchase IIA that IIA campuses could lose their accreditation, and, in direct defiance of HLC's instruction, did not inform students when the loss of accreditation happened.

7.     For at least five months thereafter, Defendants made false and misleading representations to Named Plaintiffs and other similarly situated students regarding IIA's accreditation status, including stating in widely disseminated materials, that IIA campuses

"remain accredited." Defendants' misrepresentations violated the ICFDPA and Illinois common law.

8.      For those same five months, Defendants also concealed from Named Plaintiffs and other similarly situated students for those same five months that IIA had lost its status as an accredited institution of higher education. Defendants' concealment violated the ICFDPA and Illinois common law.

9.      During this same five-month period, as part of their recruitment of new students, Defendants not only failed to disclose that IIA had lost its accreditation, but also affirmatively represented that the school "remain[ed] accredited."

10.     Defendants did not disclose the truth to students until public reports surfaced revealing their deceptive and misleading representations regarding accreditation.

11.     Named Plaintiffs discovered the truth about IIA's lack of accreditation between approximately June 20, 2018 and July 10, 2018, when they returned from a break following the spring quarter in order to start the summer quarter.

12.     Defendants continued to make false and misleading representations after July 10, 2018, including that IIA was likely to reobtain accreditation and that credits earned since IIA lost accreditation would be deemed fully accredited once IIA's accreditation was ultimately reinstated. IIA's accreditation was never reinstated.

13.     Defendants' misrepresentations and omissions of material facts regarding IIA's lack of accreditation violate the ICFDPA and Illinois common law and have caused substantial harm to Named Plaintiffs and over 1,000 similarly situated students.

14.     On December 28, 2018, twenty-two days after Plaintiffs filed their complaint, IIA closed. Twenty-one days later, on January 18, 2019 and with the express purpose of seeking to

avoid entering into bankruptcy, DCEH, IIA, and IIA-Schaumburg went into federal receivership in the Northern District of Ohio. *See Digital Media Solutions, LLC v. South University of Ohio, LLC et al.*, Case No. 1:19-cv-145 (N.D. Ohio Jan.18, 2019) ("Receivership").

## JURISDICTION AND VENUE

15.     Plaintiffs filed the original complaint in this case in the Circuit Court of Cook County. Illinois, Chancery Division on December 6, 2018 and Defendant IIA-Schaumburg removed the action to this Court on February 7, 2019 on the basis of complete diversity.

16.     Jurisdiction is proper under 28 U.S.C. § 1332(a) for the reasons set forth in IIA-Schaumburg's Notice of Removal. Dkt. 1.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

18.     Named Plaintiff Emmanuel Dunagan is a natural person who resides, and at all relevant times has resided, in Bellwood, IL. Mr. Dunagan was enrolled as a student at IIA-Chicago from December 2014 until he graduated in December 2018.

19.     Named Plaintiff Jessica Muscari is a natural person who resides, and at all relevant times has resided, in Wheaton, IL. Ms. Muscari was enrolled as a student at IIA-Chicago from April 2015 until she graduated in September 2018.

20.     Named Plaintiff Robert J. Infusino is a natural person who resides, and at all relevant times has resided, in Addison, IL Mr. Infusino was enrolled as a student at IIA-Schaumburg from October 2015 until he withdrew in September 2018.

21.     Named Plaintiff Stephanie Porreca is a natural person who resides, and at all relevant times has resided, in Wood Dale, IL.  Ms. Porreca was enrolled as a student at IIA-Schaumburg from July 2014 until she graduated in June 2018.

22.     Defendant IIA-Schaumburg is an institution of higher education located in Schaumburg, IL and owned by Defendant IIA.

23.     Defendant IIA is an institution of higher education with campuses located in Chicago, IL, Schaumburg, IL, and Novi, MI.  The Chicago campus, referred to herein as IIA-Chicago, is Defendant IIA's primary campus and, unlike IIA-Schaumburg, is not a distinct legal entity.

24.     Through an intermediary company known as Art Institutes International, LLC, IIA is a subsidiary of Defendant DCEH.

25.     Defendant DCEH is an Arizona non-profit limited-liability company that was formed on January 9, 2017 to facilitate the sale of assets between EDMC and Defendant DCF.  DCEH's principal offices are located in Pittsburgh, Pennsylvania and Chandler, Arizona.  At all times relevant to this complaint, DCEH owned and, together with one or more other Defendants, operated all of Defendant IIA's campuses.

26.     Defendant DCF was organized as a California non-profit corporation on January 8, 2008.  DCF's principal office is located in Los Angeles, CA.

27.     DCF is the sole owner of DCEH and the ultimate parent company of the buyers in the EDMC transaction.   At all times relevant to this complaint, DCF owned and, together with one or more other Defendants, operated all of Defendant IIA's campuses.

28.     Defendants John Doe 1-10 are officers and/or directors of one or more Defendants.

29.     Defendants were, at all relevant times, engaged in trade and commerce in the state of Illinois and/or controlled the engagement of trade and commerce in the state of Illinois.

30.     At all relevant times, Defendants advertised, offered for sale, sold, and solicited to Illinois consumers to enroll in educational courses and degree-granting programs at IIA's Illinois campuses.

## FACTUAL ALLEGATIONS

**Dream Center Background**

31.     The LA Dream Center is a Pentecostal Christian organization based in Los Angeles, CA.  Both the LA Dream Center and DCF operate out of 2301 Bellevue Ave, Los Angeles, CA 90026.  The LA Dream Center is also commonly known as the Dream Center.

32.     Defendant DCF is primarily responsible for funding and supporting the mission of the LA Dream Center, which includes an affiliate network of over 45 Dream Centers ("Dream Center Network").  DCF's purpose, according to its Articles of Incorporation, is "to promote social welfare in the community" by funding the LA Dream Center and the Dream Center Network.

33.     To become a member of the Dream Center Network, there is an application process and annual membership fee of $2,500, which includes use of the trademarked "Dream Center" name.

34.     Prior to the facts alleged herein, neither DCF nor the LA Dream Center had experience operating institutions of higher education.

**Defendant DCF Purchases IIA from EDMC and Represents That Its Ownership Will Lead to Substantial Benefits for Students**

35.     Since 2014, DCF had been "actively exploring formal educational partnerships to possibly acquire an accredited university or university system with a focus on acquiring a for-

6

profit educational institution who would benefit from becoming non-profit." *See* Press Release, Dream Center, Acquisition of Education Management Corporation (Mar. 3, 2017), *available at:* https://dreamcenter.org/dream-center-foundation/.

36.     From those explorations emerged "an amazing opportunity for the Dream Center Foundation to acquire 3 university systems from [EDMC], and turn those systems into community focused not-for-profit educational institutions." *Id.*

37.     On March 3, 2017, EDMC executed an agreement for the sale of substantially all of its assets and schools to DCF, including the assets of IIA, for $60 million.

38.     Shortly after the March 3, 2017 announcement, Defendants proclaimed on Art Institute websites, including IIA's, that: "NON-PROFIT = EVEN MORE [. . .] Even more affordable. Even more accessible. Even more invested." (emphasis in original).  The website contained the following image:



39.     On March 6, 2017, IIA informed students by email of EDMC's "intention to sell [IIA] to DCF, a not-for-profit institution."  IIA told students in the email that "[t]his agreement is great news for our school;" that "[t]he Illinois Institute of Art-Chicago is not going out of

business;" and that "you and your fellow students will have the opportunity to continue your current programs of study and graduate on time and without interruption."

40.     The March 6 email continued:

After the deal is finalized later this summer, we will exist as a not-for-profit, stand-alone entity owned by DCF, giving you and your instructors the chance to learn and teach in environment [sic] that is free from the challenges of the for-profit higher education sector. This opportunity truly aligns our school with the realities of today's higher education environment.

This agreement was entered into only after careful consideration. The decision was not made lightly. It is the best way to ensure continued classroom excellence and student success for you and for our future students. . . .

This is terrific news for the entire The Illinois Institute of Art - Chicago community, and we will keep you updated on our progress.

41.     According to a document titled "Three Years of Income and Expenses.pdf," which was submitted by DCF to the WASC Senior College and University Commission (the accreditor for many western-based EDMC schools purchased by DCF), DCF represented that conversion to non-profit status means "that there will be more resources available to students and faculty for scholarships through a fully staffed development office, costs savings, and tax benefits." *See* WSCUC Structural Change Site Visit Report for Argosy University (WSCUC Report) at 24, attached as Exhibit 1 hereto.

42.     DCF also told WASC that "these additional revenues - unavailable under the current for-profit structure - will greatly enhance outcomes for students, staff and faculty." *Id.*

43.     DCF completed the purchase of all IIA campuses on January 20, 2018.

**Overlap in Management, Control and Operation of All Defendants**

44.     There is significant overlap in the management, control, and operations of DCF, DCEH, and IIA.

45.     At all times relevant to this complaint, the three managers of Defendant IIA, according to the Office of the Illinois Secretary of State, were Matthew Barnett, Randall K. Barton, and Brent Richardson.

46.     As managers, Mr. Barton, Mr. Barnett and Mr. Richardson performed a variety of services for IIA, including oversight of corporate governance, contractual agreements with third parties and other enterprises.  *See* Receivership Dkt. 7-1 at 1 (Barton Decl.).

47.     Mr. Barnett, in addition to his role as a manager of IIA, is the President and founder of DCF, a member of the DCEH Board of Managers, and co-founder of the LA Dream Center.

48.     Mr. Barton, in addition to his role as a manager of IIA, is managing director of DCF, Co-Chairman of the DCEH Board of Managers, and Chief Development Officer of DCEH.

49.     Mr. Richardson, in addition to his role as a manager of IIA, was Chief Executive Officer of DCEH and Co-Chairman of the DCEH Board of Managers.  Also, Mr. Richardson's family trust provided financing to DCF in order to complete the EDMC purchase.  *See* DCF March 3, 2017 Press Release ("An affiliate of the Najafi Companies will be the principal financier of the transaction with additional financing provided by the Richardson Family Trust.").  And according to an Exclusivity Agreement dated November 11, 2016 and provided to the Department, Mr. Richardson's company, Lopes Capital LLC, has a "financial relationship" with DCF.  In November 2017, HLC found that an "apparent conflict of interest exists owing to an investment by the DCEH CEO of 10% in the purchase price for which limited documentation exists." *See* Ex. 1 to Letter from Robert C. "Bobby" Scott, Chairman of U.S. House of Representatives Committee on Education and Labor to Secretary Betsy DeVos (July 16, 2019)("Scott Letter"), attached hereto as Exhibit 2.

50.     These overlapping roles blurred the distinctions between DCEH and DCF.  In one letter describing *DCF's* vision for the schools to their primary regulator, Mr. Barton (in his capacity as Managing Director of DCF) wrote to Department Secretary DeVos on DCF letterhead: "*Our* CEO, Brent Richardson, our founder, Pastor Matthew Barnett and myself, respectfully request an opportunity for 15 minutes of your time, anywhere or anytime for a presentation to share with you *our vision to transform* these three for-profit university systems at 62 campuses across the United States to private non-profit education. . ."  *See* Letter from Randall Barton to Secretary Betsy DeVos (June 23, 2017) (emphasis added), attached hereto as Exhibit 3.

**Integration Between DCF, DCEH and the Schools Acquired from EDMC**

> ### *DCF Publicly Touted the Integration Between DCF, DCEH and the Schools*

51.     From the date the EDMC acquisition was announced, DCF touted its tight integration with the acquired schools (including IIA), claiming that these relationships would provide important benefits to students and the public at large.

52.     When DCF announced its acquisition of schools from EDMC on March 3, 2017, Mr. Barton, as managing director of DCF, stated that:

> Education has always been at the heart of the Dream Center Foundation's mission. While the Dream Center will continue to operate these institutions as they have operated, we will bring to them an expanded vision; they will be community-focused, not-for-profit institutions coupling their quality programs with a humanitarian culture that values social responsibility.

53.     Mr. Barton further emphasized that DCF wanted the LA Dream Center and the Dream Center Network to use the acquired schools to advance DCF's mission: "[f]or three years, the Dream Center Foundation has actively explored educational partnerships or acquisitions that might enhance our ability to provide quality education to scores of Americans through our

Dream Center in Los Angeles and via our partners, nationwide. We believe this is the opportunity we have been looking for, and it aligns perfectly with our mission which views education as a primary means of life transformation."

54. In its March 3, 2017 press release, DCF announced that its purchase of the EDMC schools would have numerous benefits for the Dream Center Network that it funds, including to:

- "Provide low cost or no cost GED training at each campus in conjunction with participating Dream Centers";

- "Offer academic programs on-site and/or through 'on-line' at Dream Centers throughout our network";

- "Provide scholarships for graduates from the network of Dream Centers"; *and*

- "Provide pathways and scholarships for higher education for the thousands of [Dream Center] volunteers and interns."

55. DCF also stated in the press release that its purchase of the schools would: "[c]onnect graduates to jobs through job placement programs throughout the Dream Center Network, and through expanded job placement efforts at each college campus site."

56. On October 17, 2017, DCF issued a press release stating that "the relationship between the schools and the Dream Center Foundation will allow these schools to continue to provide students with an excellent education and strengthen their sense of social responsibility."

57. DCF also announced that the acquired schools would provide financial benefits to the LA Dream Center and the Dream Center Network, explaining that it was converting the EDMC schools into non-profit institutions, "with the intent of investing a percentage of revenue" into programs "supported by the Dream Center Foundation in Los Angeles and throughout the United States."

58. After DCF's purchase was announced, a "Word from Brent Richardson CEO of DCEH" was posted on DCEH's website. Mr. Richardson stated:

11

Hello and welcome to Dream Center Education Holdings or as we like to refer to it, DCEH. For the first time in history, we have converted a publicly traded company into a not for profit organization. Our schools historically have provided access to education for the under-served and now, as non-profit institutions, our commitment to being an integral part of the communities where we live, work and educate our students is more important than ever.

59.     Mr. Richardson continued:

The Dream Center has a legacy of impacting peoples' lives by empowering them to make a difference in their own lives and in the lives of those around them. This aligns perfectly with our vision and focus on positively impacting the lives of our students each day by providing them a world-class education. We are excited and proud for this opportunity to change the way education is perceived in this country and around the world.

60.     Mr. Richardson's message concluded by asking students to "please take a moment to watch this Dream Center video and see why we are so excited and honored to be part of this organization," and links to a video message from "Pastor Matthew [Barnett] of the Dream Center."

### *DCF Represented to the Department and Others That it Planned to Both Own and Operate the Acquired Schools*

61.     DCF repeatedly stated that it was going to both own *and* operate the acquired schools.  According to a February 24, 2017 commitment letter from Najafi Companies LLC (the primary financier of the DCF acquisition) to Mr. Barton, "[DCF] has represented that it intends to acquire, own and operate the Schools as 'nonprofit institutions' as defined in the applicable DOE regulations and as tax-exempt organizations for the 'advancement of education' as defined in Code Section 501(c)(3)."

62.     Similarly, in a March 21, 2017 email from Ronald Holt, counsel for DCF, to Steve Finley, an attorney in the Department's Office of the General Counsel, Mr. Holt stated that DCF plans to "form and operate" the schools as non-profits.

63.    In his June 23, 2017 letter to Department Secretary DeVos on DCF letterhead, Mr. Barton (in his capacity as Managing Director of DCF) requested: "15 minutes of your time" to discuss DCF's "vision to transform" the schools.  *See* Exhibit 3.

64.    The Department also placed obligations for the schools directly upon DCF. For example, as part of its September 12, 2017 pre-acquisition review, the Department determined that if the schools enter into Provisional Program Participation Agreements, "DCF will be required" to maintain a Letter of Credit in an amount to be determined by the Department.

### *DCEH and DCF Elected To Be Treated As a Single Entity for Tax Purposes*

65.    DCF held IIA out as a non-profit because DCF, IIA's corporate parent, was a non-profit for tax purposes.  However, IIA did not receive approval from the Department to operate as a non-profit institution of higher education pursuant to Department regulations.

66.    In his March 21 email to Mr. Finley, Mr. Holt wrote: "Because all entities downstream from DCF will be single member LLCs, of which DCF will be the ultimate upstream single member, all of the subsidiaries will share DCF's tax exempt status. Attached is a memorandum on this point prepared by Randy Barton, who is a tax exempt attorney, in addition to being the Managing Director of DCF."

67.    Under the corporate structure adopted by DCF, IRS regulations permitted DCEH to choose either to be recognized or disregarded as an entity separate from DCF.  IRS Guidance 2013-0006 (Jan. 16, 2013).

68.    DCF and DCEH chose treatment as a "disregarded entity" for DCEH, meaning that DCEH received "the benefit of [DCF's] tax-exempt status." *Id.*

69.    With this election, DCF was required to "treat the operations and finances of [DCEH] as its own." *Id; see also* IRS PLR 201603032 (Jan. 15, 2016) (when an entity chooses to

be "disregarded" its operations are "treated as a branch or division" of its sole owner). For example, under IRS regulations, if DCEH's organizational documents provided that DCEH would be operated for purposes contrary to the tax-exempt purposes of DCF, the tax exempt status of DCF may be adversely affected.

*Accreditation Documents Confirm the Integration Between DCF, DCEH and the Schools*

70.     On April 12, 2017, accreditor WASC Senior College and University Commission issued a "Structural Change Site Visit Report" for Argosy University, one of the EDMC school systems purchased by DCF ("WSCUC Report"). Exhibit 1.

71.     The WSCUC Report addressed the extent to which the mission and focus of the acquired schools would be influenced by the mission of DCF and its Dream Center Network. The Report states:

> The visit team was repeatedly told that there would be no change of mission or culture post-transition that would shift Argosy's current vision and goals. As grounds, the officers of DCF and DCEH cited the fact that there would be "three degrees of separation" between the faith-based organization, the Dream Center, and Argosy University. *It is interesting to note that the co-founder of the Dream Center did not emphasize this separation; instead, he emphasized the multiple ways that Argosy University could help to support the mission of the Dream Center.* The visit team notes that, as mentioned above, the co-founder is also the President of the Dream Center Foundation and a Board Member of DCEH.

WSCUC Report at 21 (emphasis added).

72.     The WSCUC Report further discusses at length the "synergy and benefits of the acquisition" for DCF and its network of Dream Centers.

73.     According to a DCF "structural change proposal" quoted in the WSCUC Report, DCF desired to acquire EDMC "so that it can expand the services that the Dream Center Network provides" by making education available to the Dream Center's "existing clients." *Id.* at 7.

74.     DCF's proposal also stated that "bringing Dream Center staff, clients, or volunteers" into the acquired schools would be a "benefit" of the acquisition. *Id.* at 24.

75.     In addition, DCF stated that the faculty, staff, students, and graduates of the acquired schools would serve as "partners in providing counseling, education, and volunteer services to the communities and families served by the Dream Center Network around the United States, thus expanding the services of the Dream Center Network." *Id.* at 7.

76.     Marketing and admissions teams reported that "the new relationship with DCF and [DCEH] will strengthen marketing and enrollment capacities [and] . . . . emphasize[d] that the DCF relationship will provide students opportunities to participate in internships and student placements at clinics and programs operated by DCF such as the Dream Centers." *Id.* at 25-26.

77.     These synergies were also financial. According to WSCUC, DCF entered into an operating agreement with DCEH that "includes language on capital contributions from DCF to [DCEH], as well as distribution of assets from [DCEH] to DCF." *Id.* at 14.

78.     The WSCUC Report ultimately concluded about the relationship between DCF, DCEH, and the acquired schools that:

> This issue is not black-and-white. Legally, there are indeed "three degrees of separation" between the Dream Center and Argosy University (DC - DCF - DCEH - Argosy). Yet online documents and some comments made during the visit are more ambiguous. Also, comments by faculty showed that they expect to be training and educating staff and clients from the Dream Centers. In another area of ambiguity, the initial proposal suggested that the excess net contribution from Argosy University would be available to DCF. In a later document, this amount was limited to $1.5M for the first 2 years post-acquisition but not capped after that point. Should the net revenue be used by the DCF board for Dream Center purposes, then the existence of three degrees of separation would be less clear. Hence the visit team was unable to establish that the change of ownership will leave Argosy's mission completely unchanged. It was also not able to establish that the change of ownership will bring about a direct or indirect change of mission, a result that would trigger a Comprehensive Review by WSCUC.

*Id.* at 22.

79.     After an initial investigation, another accreditor of the schools purchased by DCF from EDMC found sufficient factual basis for requiring further inquiry into whether or not DCF and DCEH were in fact separate and independent.

80.     On June 21, 2018, the Middle States Commission on Higher Education (the accreditor for many Midwest-based EDMC schools purchased by DCF) ("Middle States") requested supplemental information from DCEH documenting: "the breadth of the relationships involving the related entities, Dream Center Foundation and Dream Center Education Holdings (DCEH), including the identification of contractual relationships, employment, and family or financial interests that could pose or be perceived as conflicts of interest."

81.     Middle States renewed this request in an "accreditation action" dated July 18, 2018, and also stated that "the institution failed to inform the Commission about any and all developments relevant to the terms of the change in ownership and legal status as directed in the Commission action of November 16, 2017."

82.     On November 19, 2018, Middle States issued a show-cause letter to DCEH once again requiring evidence of: "the breadth of the relationships involving the related entities, Dream Center Foundation and Dream Center Education Holdings (DCEH), including the identification of contractual relationships, employment, and family or financial interests that could pose or be perceived as conflicts of interest."

83.     On information and belief, neither DCF nor DCEH provided answers to these accreditors' questions.

*Faced with Shuttered Campuses and Increasing Public Scrutiny, the Dream Center
Denies Any Affiliation With DCEH and the Acquired Schools*

84.     After DCEH was placed into the Receivership and shuttered campuses throughout the country, DCF's purchase of the EDMC schools became the focus of intense public scrutiny. *See, e.g.,* Stacy Cowley and Erica L. Green, "A College Chain Crumbles, and Millions in Student Loan Cash Disappears," N.Y. Times (Mar. 7, 2019), *available at:* https://www.nytimes.com/2019/03/07/business/argosy-college-art-insititutes-south-university.html; Michael Vasquez, "The Nightmarish End of the Dream Center's Higher-Ed Empire," *CHRONICLE OF HIGHER EDUC.* (Mar. 9, 2019), *available at:* https://www.chronicle.com/article/The-Nightmarish-End-of-the/245855; Letter from 84 Members of Congress to Secretary Betsy DeVos re: Dream Center (Mar. 13, 2019), attached hereto as Exhibit 4.

85.     In response to this scrutiny, DCF and the LA Dream Center have disavowed any knowledge of or relationship to the schools that less than two years prior were "at the heart of the Dream Center Foundation's mission."

86.     In one tweet responding to the comments of a concerned citizen, the LA Dream Center—which is led by Mr. Barnett and Mr. Barton and which DCF calls "our Dream Center in Los Angeles"—wrote on March 11, 2019: "We're so sad to hear about these closures [ ] and the impact it has had on your family and every person involved. The @LADreamCenter is actually an entirely different entity than DCEH and is no way involved, as much as we would love to help. We wish you all the best!"

87.     In response to another concerned citizen who cited to an article about DCF's purchase of the schools, the LA Dream Center stated via Twitter on March 13, 2019: "We're not the parent organization of DCEH or affiliated with them. In fact, we're not even in the same

state. But there's a lot of confusion out there because of the common name and misunderstandings w/ media. DM us for more info!:)."

88.     In response to yet another inquiry from a concerned citizen, the LA Dream Center explained via Twitter on March 18, 2019: "@LADreamCenter is an entirely separate entity from DCEH and not involved, as much as we would love to help all of those students and families in that situation. For more information about DCEH, please visit their website at https://www.dcedh.org/. Thank you!"

89.     Another citizen wrote to Angelus Temple—described on the LA Dream Center website as the "church of the Dream Center" where Mr. Barnett serves as the Senior Pastor—to ask if they were the "Christian nonprofit with no experience in higher education" that had purchased the EDMC schools.  In response, the Angelus Temple twitter stated on March 18: "the @LADreamCenter is actually an entirely different entity, as are we, and are not involved in the current situation with DCEH. For more information, please contact DCEH at https://www.dcedh.org/  . God bless you!"

90.     The same citizen responded: "My apologies. The article states, 'Two years later, the charity affiliated with a Pentecostal megachurch..' and linked to your site. If you are in anyway affiliated with this company, even if not, so many students have been devastated, and need your prayers."  In response, Angelus Temple stated: "Yes, unfortunately there has been a lot of misunderstanding in the news. Our hearts go out to each and every one of those students, faculty, and families affected by the situation. Thank you for joining us in praying for them! God bless!"

**The Importance and Value of Institutional Accreditation**

91.     Institutional accreditation is the primary means of assuring and improving the quality of higher education institutions and programs in the United States.

92.     Accreditation is the most powerful signal to students, employers, and the public that they can have confidence in a college or university.

93.     On its consumer information page, the Illinois Board of Higher Education states: "When you're looking around at Illinois schools, be sure the institution you select is accredited. Accreditation, by various nonprofit bodies, guarantees that the degree granted by an institution meets the accrediting body's standards of quality and content."  *See* Ill. Bd. of Higher Educa., Consumer Information, *available at:* http://legacy.ibhe.org/consumerInfo/authorize.htm.

94.     Accreditation is especially critical to students' efforts to obtain employment and transfer credits to other educational institutions.

95.     With respect to employment, accreditation signals to prospective employers that a student's educational program has met widely accepted standards.

96.     With respect to transferability, accreditation indicates to educational institutions receiving and processing requests for transfer that the sending institution has met threshold expectations of quality.

97.     When a school lacks accreditation, it is a signal to employers and other educational institutions that the school may offer a sub-par education.

98.     For that reason, a student wishing to transfer credits to a different school or obtain employment will be at a significant disadvantage if the student attends or attended a school that lacks accreditation.

**The Change of Control to DCF Causes IIA to Lose Accreditation on January 20, 2018**

99.     From the date Named Plaintiffs enrolled at IIA through January 19, 2018, IIA was accredited by HLC.  HLC accredits approximately 1,000 degree-granting colleges and universities that are based in a nineteen-state region of the United States, including Illinois.

100.     On November 16, 2017, HLC formally notified Defendants, by letter to the Presidents of the Art Institute of Colorado, IIA, and Brent Richardson, Chief Executive Officer of DCEH, that the schools would be placed in the pre-accreditation status identified as "Change of Control Candidate for Accreditation."  Ex. 1 to Scott Letter.  In order to restore the accreditation of IIA and the Art Institute of Colorado, Defendants were required, among other things, to provide "[e]vidence that the DCF, DCEH, DCEM, and the Art Institute Organizations . . . have organizational documents and have engaged in a pattern of behavior that indicates the respective boards of the institutions have been able to engage in appropriately autonomous oversight of their institutions." The letter explained that HLC could "reinstate accreditation" after a review that would take place, at the earliest, six months after the closing date of the transaction.  Defendants accepted this change in status.

101.     By letter dated January 12, 2018, HLC stated that the institution must "portray its accreditation status with [HLC] clearly to the public,"  that HLC "anticipates that the institutions have properly notified their students . . . and have clearly stated its impact on current and prospective students," and that it "expects that the institutions have also provided proper advisement and accommodations to students in light of this action, which may include, if necessary, assisting students with financial accommodations or transfer if they so request." Ex. 2 to Scott Letter, Higher Learning Commission, Public Disclosure Notice (Jan. 12, 2018).

102.     Defendants did not inform IIA or Art Institute of Colorado students of this change of status before they enrolled for the academic semester beginning in January 2018.

103.    On January 20, 2018, the date that EDMC's sale of IIA and other schools to DCF closed, HLC formally removed IIA's status as an accredited institution of higher education and placed it instead on "Change of Control–Candidacy" status.

104.    HLC removed IIA's accreditation pursuant to its policy and procedure governing "change of control" reviews.  That policy required DCF to address a range of "approval factors," including but not limited to: the extension of the mission, educational programs, student body, and faculty that were in place during HLC's last evaluation; the likelihood that the institution would continue to meet HLC requirements; the sufficiency of financial support for the transaction; and the new owner's previous experience in higher education and accreditation, qualifications, and resources.  *See generally* HLC Policy INST.F.20.070 ("Processes for Seeking Approval of Change of Control.")

105.    Defendants have never disclosed the contents of HLC's change of control review to students or to the public.

106.    Under "Change of Control–Candidacy" status, IIA was not an accredited institution of higher education, but rather was a candidate school *seeking* accreditation.

107.    Under such "candidacy" status, IIA remained eligible to receive federal funds under Title IV of the Higher Education Act ("HEA").

108.    The period of IIA's candidacy status was to last a minimum of six months to a maximum of four years.

109.    With the six-month minimum, the earliest IIA could have re-attained HLC accreditation was on or around July 20, 2018.

110.    HLC instructed IIA, beginning January 20, 2018, to inform students taking classes or graduating during the candidacy period that their "courses or degrees are not accredited by

HLC and may not be accepted in transfer to other colleges and universities or recognized by prospective employers."  Ex. 2 to Scott Letter.

111.    HLC also required IIA to provide proper advisement and accommodations to its students in light of the loss of accreditation, including assisting students with financial accommodations or transfer arrangements, if requested.

112.    DCF, through its managing director, Mr. Barton, was aware of HLC's decision to remove IIA's accreditation and its instruction to inform and provide accommodations to students.

113.    HLC's directive to inform students regarding the loss of accreditation was consistent with Defendants' legal duty not to engage in substantial misrepresentations or omissions.

114.    Under Department regulations, an institution of higher education receiving federal funds under Title IV of the HEA is prohibited from making "substantial misrepresentation[s] about the nature of its educational program, its financial charges, or the employability of its graduates." 34 C.F.R. § 668.71.   A substantial misrepresentation includes "any statement that omits information in such a way as to make the statement false, erroneous, or misleading."  81 Fed. Reg. 76072.

115.    A misrepresentation concerning "the nature of an eligible institution's educational program" explicitly includes, but is not limited to "false, erroneous or misleading statements concerning - (a) The particular type(s), specific source(s), nature and extent of its institutional, programmatic, or specialized accreditation."  34 C.F.R. § 668.72(a); *see also* 34 CFR § 668.14(b)(1) (requiring institutions that participate in the Title IV program under the HEA to

"comply with all statutory provisions of or applicable to Title IV of the HEA" as well as "all applicable regulatory provisions prescribed under that statutory authority").

**Defendants Conceal IIA's Loss of Accreditation from Named Plaintiffs and the Putative Class and Affirmatively Misrepresent that IIA is Accredited**

116.    After IIA lost its accreditation due to the change in control from EDMC to DCF, Defendants did not inform prospective, current, or former students.

117.    Instead, on January 23, 2018, three days after losing its status as an accredited institution, IIA-Schaumburg President David Ray sent an email to all IIA-Schaumburg students to share the "very exciting news" that, following the change of control to non-profit DCF, IIA-Schaumburg "is now a non-profit institution!"

118.    Also on January 23, 2018, the president of IIA's Novi, Michigan campus, Tracey Bass, sent an email to all Novi students to share the "very exciting news" that, following the change of control to non-profit DCF, the Novi campus "is now a non-profit institution!"

119.    On January 24, 2018, IIA-Chicago President Josh Pond sent an email to all IIA-Chicago students to share the "very exciting news" that IIA-Chicago "is now a non-profit institution!"  The email invited students to "[p]lease stop by the Student Lounge tomorrow (Thursday), January 25 between 11AM and 1PM for a cake and ice cream celebration!"

120.    The January 23 and 24 emails did not inform students that the IIA campuses had just lost their accreditation due to the change in control from EDMC to DCF.

121.    These emails also did not disclose to students that, although IIA was a non-profit for tax purposes, it had not been granted approval to operate as a non-profit by the Department.

122.    On February 28, 2018, Defendants published a "Catalog Addendum" to IIA's 2017-2018 course catalog.  The only item addressed in the addendum was an "Accreditation Update," which stated:

23

**Accreditiaton [sic] Update**
***The following fully replaces the Institutional Accreditaiton [sic] Statement on page 5 of the current:***

**Institutional Accreditation**
The Illinois Institute of Art is in transition during a change of ownership. *We remain accredited* as a candidate school seeking accreditation under new ownership and our new non-profit status. Our students remain eligible for Title IV.

(emphasis added).

123.    On April 26, 2018, Defendants published a spring course catalog for 2017-2018,

which stated:

**Institutional Accreditation**
The Illinois Institute of Art is in transition during a change of ownership. *We remain accredited* as a candidate school seeking accreditation under new ownership and our new non-profit status. Our students remain eligible for Title IV.

(emphasis added).

124.    Also on April 26, 2018, a "Letter from the College President" was posted in the

IIA coursebook and sent to students stating:

On behalf of the faculty and staff at The Illinois Institute of Art, I am so pleased that you are considering furthering your education at one of our schools. Our students are driven by a passion for their chosen fields and we are proud to provide a career-focused education that can channel those passions into your life's work. . . . We cultivate our students' creativity from the day you walk into your first class until the day you walk across the stage in your cap and gown. Our objective is to give you the tools you need to achieve your goals. We look forward to welcoming you into our school and wish you success in all your endeavors.

125.    Although Defendants disagreed with HLC's decision to remove IIA's

accreditation (and its directive to inform students of the loss of accreditation), communications

amongst Brent Richardson, Randall Barton, other executives, and outside counsel reveal that

they instead made a calculated decision not to promptly appeal or otherwise challenge HLC's

decision.

126.    In email exchanges with Richardson and Barton between April 17-19, 2018, outside counsel advocated that rather than attacking HLC's public notice about the nature of accreditation, it should "let it sit," because it "[p]rovides more runway to operate."  Ex. 6 to Scott Letter.

127.    On May 31, 2018, outside counsel sent an email to DCEH general counsel Chris Richardson, copied to Randall Barton, Brent Richardson and other executives attaching a draft proposed notice to students of IIA and the Art Institute of Colorado that communicated that it was "beginning the process of pursuing an internal appeal with HLC."  This notice was never sent.  Ex. 9 to Scott Letter.

128.    According to the email transmitting the draft notice, this proposed notice to students was developed following receipt of a memo from the Settlement Administrator for a Consent Judgment entered into between DCEH's predecessor and States' Attorneys' General (and succeeded to by DCEH when it purchased the schools from EDMC), who "has called out DCEH on the fact that we have told the students of the HLC schools that the schools remain accredited but HLC on its website says they do not." *Id.*

129.    The transmittal email goes on to say that "our response to the Administrator explains we were misled by HLC and are now appealing HLC's actions and that we will be issuing notice to the students to inform them of the appeal we are taking." *Id.*

130.    However, the plan was not to actually appeal HLC's decision, but rather to pretend to.  Outside counsel's email states that "even if all we do is set up a meeting with the HLC Executive Committee in Chicago to get them to 'stand down' to some extent on their position, we are still 'appealing' or challenging the HLC position, so sending out the notice now,

but later not actually pursuing a full-blown internal appeal would not be inconsistent. But that is something that you and Randy will have to weigh." *Id.*

131.  Randall Barton approved this plan of not actually appealing the HLC decision. In an email dated May 31, 2018, he asked (writing from a gmail account, not a DCEH email address) "why appeal if we are going to close these schools." Ex. 7 to Scott Letter. As of that date, Defendants had not disclosed to IIA students that the courses they were taking were not accredited, that they were foregoing an appeal of HLC's decision, or that they intended to close IIA.

132.  If Defendants had formally appealed HLC's decision, they might have succeeded in maintaining accreditation for the courses the students took in 2018. By not doing so, however, they avoided revealing to students that IIA was not accredited. Many IIA students graduated in June 2018, without knowing that their degrees were unaccredited.

133.  Defendants did not formally appeal HLC's accreditation decision until at least June 27, 2018, by which time the loss of accreditation had been exposed in media reports and Defendants had decided to close IIA.

134.  In addition to misleading its student body, Defendants continued, throughout the winter and spring of 2018, to recruit new students to enroll in IIA-Chicago and IIA-Schaumburg.

135.  During this time, Defendants held open houses where staff provided information about IIA to prospective students.

136.  During these open houses and other recruitment efforts, Defendants did not disclose to prospective students that IIA was an unaccredited school.

137.  In addition, Defendants affirmatively represented in IIA's enrollment agreements after January 20, 2018 that the school was accredited. Like the course catalogues, the enrollment

26

agreements stated: "We remain accredited as a candidate school seeking accreditation under new ownership and our new nonprofit status."

138.     During the same time period that Defendants were concealing that IIA had lost its accreditation, DCF and DCEH reached the conclusion that the schools they had purchased were in financial jeopardy.

139.     According to Mr. Barton's declaration filed in the Receivership proceeding, shortly after the loss of accreditation, "DCEH discovered that the actual revenues fell far short of the projections provided by EDMC, in an amount in the tens of millions of dollars, while overhead fixed costs were significantly in excess of the EDMC's representations." Receivership Dkt. 7-1 at ¶ 6.

140.     Mr. Barton further explained that DCEH's best efforts "clearly would not be enough to balance what was now projected to be a substantial operating deficit. . . . Absent some sort of cure, *DCEH forecasted an inability to meet all of its financial obligations by December of 2018.*" *Id.* at ¶ 6 (emphasis added).

141.     Defendants did not disclose this information to current or prospective students.

142.     Instead, Defendants continued to actively recruit and enroll new students.

143.     On June 1, 2018 a long-time employee of the Art Institute of Colorado who worked in admissions submitted a resignation letter to Brent Richardson stating, in part:

> The events of the last six months have made it impossible for me to continue my employment.  I can no longer continue enrolling students without compromising my ethics and morals.  When the admissions department was initially told about our "Change of Status Candidacy" it was presented as a misunderstanding with HLC that would quickly be resolved.  Our team was told to "punt" on any questions we received about that status and to change the conversation to a more favorable topic…My heart breaks for the students who have trusted us so completely.  Our July class has students who have shelled out money for plane tickets to visit the campus, turned down scholarships to other institutions, and left other stable opportunities for the reputable education they believe we will give

27

them. These students have not been given all of the necessary and appropriate information they need to make the best choice for their own futures. If our HLC visit does not result in our accreditation being restored, these students will have tangible damages against the school and I want no part in that legal debacle. . . . Unfortunately, instead of reassurance, the only actions taken have been to increase our July start goal.

Ex. 10 to Scott Letter. As of the date of this letter, Defendants still had not told students that IIA and the Art Institute of Colorado had lost accreditation.

**Defendants' Concealment of IIA's Loss of Accreditation is Exposed**

144.  On or around May 16, 2018, Defendants became aware of public reports regarding their deceptive and misleading representations to students about their accreditation status.

145.  A May 16, 2018 article in the online publication *Republic Report* stated:

As a DCEH employee told me: "These students don't know that they just graduated from an unaccredited school. They have no idea. They don't know they may not be eligible for jobs." The employees say that DCEH is not directing campuses to tell graduates and current students about the unaccredited statuses of their schools.

*See* David Halperin, "Inside a For-Profit College Conversion: Lucrative Ties, Troubling Actions," *Republic Report* (May 16, 2018), *available at:*

https://www.republicreport.org/2018/inside-a-for-profit-college-conversion-lucrative-ties-troubling-actions/.

146.  On June 1, 2018, Mr. Richardson distributed an email to DCEH employees—but not to students—attacking the author of the article as "a long-time critic of the proprietary higher education sector." Although Mr. Richardson's email stated that "Dream Center Education Holdings Leadership is aware" of the allegations in *Republic Report*, it did not address the article's allegation that DCEH was misrepresenting and concealing its loss of accreditation from students and graduates.

147.    Through the knowledge of its executive leadership (Mr. Barnett and Mr. Barton), DCF knew, on or around January 20, 2018, that IIA lost accreditation.

148.    Through the knowledge of its executive leadership (Mr. Barnett and Mr. Barton), DCF also knew that IIA students had not been informed that their school was unaccredited as a result of DCF's purchase, and that IIA was continuing to represent that it "remain[ed] accredited."

149.    At no time from January 20, 2018 on did DCF disclose to students or the public that the IIA was not accredited.

150.    Upon information and belief, on or around January 20, 2018 one or more John Doe defendants instructed IIA's campus presidents to inform students that their school was now a non-profit but not to disclose to students that their school had lost accreditation.

151.    Upon information and belief, one or more John Doe defendants ordered that the "we remain accredited" language be used in the course catalogues, enrollment agreements, on the website, and in other IIA materials.

152.    If Defendants had disclosed the loss of accreditation following completion of the sale to DCF, students would have elected to leave IIA rather than take unaccredited courses, which would have exacerbated the financial exposure to DCF and DCEH from the EDMC acquisition.

153.    Disclosure of the loss of accreditation also would have jeopardized the numerous other synergies and benefits of the acquisition for DCF and its Dream Center Network, *supra*, which DCF had been publicly touting since March of 2017.

154.     Students graduated from IIA between January 20, 2018 and June 19, 2018 without being informed by Defendants that the courses they had taken from January 20, 2018 onwards were not accredited and that the degree IIA conferred on them was from an unaccredited school.

**Defendants Finally Inform Students that IIA is not Accredited and that IIA is Closing, but Continue to Conceal and Misrepresent Material Facts**

155.     As late as June 19, 2018, Defendants still had not communicated to students that IIA lost its accreditation on January 20, 2018.

156.     Until on or around June 19, 2018, IIA's websites contained the following disclosure: "We remain accredited as a candidate school seeking accreditation under new ownership and our new non-profit status."

157.     The same disclosure appeared in IIA's course catalogs until August 6, 2018.

158.     On June 19, 2018, the *Pittsburgh Post-Gazette* published an article exposing that HLC had removed the school's accreditation on January 20, 2018, and that "Art Institute schools [including the Chicago and Schaumburg schools] failed to communicate that change to students, as the Higher Learning Commission had instructed in its Jan. 20 letter to Dream Center."  Daniel Moore, "Deal Under Scrutiny as Art Institutes Face Accreditation Setbacks," *PITTSBURGH POST-GAZETTE*  (June 19, 2018), *available at:* https://www.post-gazette.com/business/career-workplace/2018/06/19/Deal-under-scrutiny-Art-Institutes-accreditation-setbacks-dream-center/stories/201806140022.

159.     The *Post-Gazette* article went on to say that "Dream Center continued to post statements online and in school catalogs that the schools 'remain accredited.'"  *Id.*

160.     The next day, IIA-Schaumburg President Ray and new IIA-Chicago President Jennifer Ramey sent identical emails to current IIA-Schaumburg and IIA-Chicago students informing them that "[w]e are a candidate school seeking accreditation under new ownership and

30

our new non-profit status. During candidacy status, an institution is not accredited[,] but holds a recognized status with HLC indicating the institution meets the standards for candidacy. Our students remain eligible for Title IV funding. DCEH continues to actively work with HLC to earn reinstatement of accreditation."

161.    The June 20 emails were the first communication that students, including Named Plaintiffs, received from Defendants acknowledging that IIA-Schaumburg and IIA-Chicago were not accredited.

162.    The June 20 emails did not inform students that IIA-Schaumburg and IIA-Chicago lost accreditation five months prior.

163.    School was not in session when the June 20 emails went out.

164.    On June 21, 2018, IIA-Chicago President Ramey sent a similar email to recent IIA-Chicago graduates, titled "An Update to Recent Graduates of The Illinois Institute of Art - Chicago." Unlike the June 20 email to current students, the email to recent graduates disclosed that IIA-Chicago lost accreditation on January 20, 2018.

165.    Upon information and belief, on June 21, 2018, IIA-Schaumburg President Ray sent substantially the same email to recent graduates of IIA-Schaumburg.

166.    On July 2, 2018, while students were still on break, DCEH announced that it was ceasing enrollment at IIA campuses and that all IIA campuses would close by the end of the year.

**Defendants Continue to Mislead Students About IIA's Accreditation**

167.    Students did not discover the truth about IIA's loss of accreditation until, at the earliest, June 20, 2018, and in many cases, only after they returned to school after a break on July 9 or July 10, 2018.

168.     The scene on the IIA-Chicago and IIA-Schaumburg campuses during the first days of the summer quarter was chaotic as students tried to learn what had happened with accreditation, what it meant for their past and future coursework, and what their options were in light of the school's pending closure.

169.     On July 9 and 10, IIA-Chicago President Ramey held meetings with students to address the loss of accreditation and closing of the school, but could not provide satisfactory answers to students' questions about what these developments meant for their education and prospects of completing their degrees.

170.     On July 10, 2018, President Ramey sent an email to students, stating in part:

> Thank you to those who took the time to meet today.  One of the items of feedback in today's meeting was that you would like to hear from a member of DCEH leadership.  Instead of our previously scheduled meetings for tomorrow, a member of the DCEH leadership team will be will be [sic] on campus tomorrow, July 11, to meet with you.

171.     On July 11, 2018, DCEH Chief Operating Officer John Crowley flew from Phoenix, Arizona to Chicago to meet with IIA students and staff.  Over the course of the day, he held multiple meetings with students and staff.

172.     During the July 11 meetings, Mr. Crowley made numerous false, misleading, deceptive, and conflicting statements to students, including that: (i) IIA was still accredited; (ii) IIA was likely to soon re-obtain accreditation; (iii) when IIA re-obtained accreditation, all credits earned during the period of candidacy would reflect such accreditation; and (iv) everything was "going to be okay" and "everyone is going to be accommodated."

173.     At one meeting, a student asked why DCEH did not tell students for over two quarters about the loss of accreditation.  Mr. Crowley responded that HLC "put us into what we call candidacy status, which means you're still accredited."

174.    To the contrary, as set forth above, HLC had informed DCEH on January 20, 2018 that IIA "[wa]s not accredited."

175.    Moments later, the same student stated to Mr. Crowley that IIA "is not accredited," that she had called HLC and HLC had informed her that the twenty-four credits she earned since January are "not accredited at all," and that "you should have informed us [about the loss of accreditation] immediately."

176.    Mr. Crowley responded, "I get it, I get it, I get it, I get it.  I'll take that.  It's a good criticism."

177.    During the same meeting, in response to a student demanding her money back because the school had lost accreditation, Mr. Crowley stated, "Listen.  You are not listening. I'm saying that if we get accreditation, and your credits are transferrable, then you didn't lose anything."

178.    At a different July 11 meeting, Mr. Crowley stated that: "We were put onto candidacy status.  We were under the impression it would be no problem, assume the accreditation, assume the school, assume everything . . . the fact that it is six months from February or five months from February, it blows our mind."

179.    Despite stating that the five to six-month time period "blows our mind," Mr. Crowley knew, or should have known, that six months was the minimum amount of time IIA could be in candidacy status.  In fact, Defendants were told that the process could take as long as four years.

180.    At the same meeting, Mr. Crowley told students that "we've worked with the DOE, I've personally been to Washington, we have sat with the Undersecretary of Education, and we believe that everyone is going to be accommodated.  They just have to run their process."

181.    Minutes later, Mr. Crowley conceded that, since January 20, 2018, Defendants

had been misrepresenting and omitting material facts to students regarding accreditation:

> Student: Why did the school fail to tell us that it's not accredited after January?
> You still need to inform your students.  We are paying money.
>
> Crowley: Understood, understood.  So the DOE has granted us Title IV, which
> means you are okay.  HLC said we are gonna be okay.  So we assumed we were
> gonna be okay.
>
> Student: . . . . How can you just think it is okay to not tell your students?
>
> Crowley:  After the last three meetings, I don't think it is okay.  But it is what we
> did.

182.    Moments later, after explaining that she will have to retake over a year of

coursework, the same student asked, "What are we supposed to do now?"  Mr. Crowley

responded that "the best answer is that we are working with HLC and we think it is going to be

okay."

183.    Mr. Crowley did not tell students that Defendants could have appealed  HLC's

accreditation decision when it was first made, but waited until at least June 27, 2018, after they

had decided to close IIA and the *Pittsburgh Post-Gazette* article exposing the loss of

accreditation had been published.

184.    Later during the same meeting, a different student asked, "What about

reimbursement for the people from January moving forward?"  Mr. Crowley responded, "I get it.

We have two decisions.  One, if we get the accreditation, everything is fine.  If the literal asterisk

comes along that says we are not going to get accredited, then we have to make a different

decision.  And then that opens up a whole other world in terms of finance."

185.    At the meeting, Mr. Crowley recommended that students on track to graduate

from IIA before the school closed in December 2018 stay at the school to do so.

34

186.     On July 11, 2018, an IIA student who attended the Novi, Michigan campus posted

the following description of a July 10, 2018 meeting at the Novi campus on Facebook:

> I attended the meeting yesterday as well and when I asked [school President Tracey Bass]
> why past graduates were not informed that they were graduating with unaccredited
> degrees, or why they weren't given the option to transfer to Pittsburgh online and finish
> their last semester there and get the accredited degree, she said (and the room is full of
> witnesses, including my mother and one of my teachers) that she was told IN JANUARY
> about the school losing accreditation and was directed by Dream Center to NOT TELL
> STUDENTS until they say it's ok to avoid "causing panic" while they figure things out.
> She said she was just doing as she was directed.

187.     On August 6, 2018, Defendants published an addendum to its IIA course

catalogues that deleted the "we remain accredited" language from the accreditation statement.

Regarding accreditation, the addendum provided:

**Accreditation Statement**

***The following completely replaces the Institutional Accreditation statements on
page 5 of the current catalog.***

The Illinois Institute of Art is in transition during a change of ownership.  We are
a candidate school seeking accreditation under new ownership and our new non-
profit status.  Our students remain eligible for Title IV.

188.     On or around November 7, 2018, HLC announced that IIA-Chicago and IIA-

Schaumburg would not regain accreditation, but rather would remain on candidacy status

through their announced December 2018 closure date.

189.     On November 8, 2018, the presidents of IIA-Chicago and IIA-Schaumburg sent

identical emails to students explaining that "[w]e are extremely disappointed in this unexpected

outcome and assure you we will continue to work with each of you to find the best path forward

for your continued education."  The emails further explained that "[s]tudents taking classes or

graduating during the candidacy period should know that while the institution remains in

candidacy status, their courses or degrees are not accredited by HLC."

190.    All students who graduated or will graduate from IIA on or after January 20, 2018 will have graduated from an unaccredited school.

191.    Official IIA transcripts from January 20, 2018 to the present now contain an addendum with the following disclaimer: "Effective January 20, 2018[,] The Illinois Institute of Art located in Chicago [and Schaumburg], Illinois has transitioned to being a candidate for accreditation after previously being accredited.  Institute courses completed or degrees earned during the candidacy period are not accredited by HLC."

192.    Upon information and belief, this disclaimer was not included in official transcripts before June 20, 2018.

193.    All prospective employers or transfer schools that request official student transcripts for Named Plaintiffs or the class will receive this disclaimer.

194.    From at least January 20, 2018 (if not earlier) until IIA closed, Defendants' misrepresentations and omissions regarding IIA's accreditation were made willfully and intentionally in order to mislead students about the nature of the school's accreditation.

195.    From January 20, 2018 until IIA closed, Defendants continued their participation in the Federal Direct Loan Program and continued to draw down Title IV funds under the HEA.

196.    All IIA campuses closed in December 2018 and the Receivership began on January 18, 2019.  While both IIA and DCEH are Receivership entities, DCF is not.

197.    According to the Receiver, DCEH and its subsidiaries are indebted to secured, trade, and unsecured creditors for sums in excess of $100 million. Yet the Receiver reports that there was only $5.5 million in the Receivership accounts when he seized control.

198.    According to time records supporting a petition for attorneys' fees filed by the Receiver's counsel, the Receiver is investigating whether two $750,000 transfers to the

Foundation were fraudulent transfers from any of the pre-receivership entities. Receivership Dkt. 334-1 at 27.

199.    Time records filed by the Receiver also indicate that the Receiver is investigating bonus payments made to DCF and/or DCEH executives as the schools were collapsing, and is in possession of a pre-Receivership "bonus payment list." Receivership Dkt. 333-3 at 25.

200.    Also, around the time the Receivership began, at least $16 million in federal student loan stipend money belonging to DCF's Art Institute and Argosy University students—which they rely on for living expenses such as rent, mortgages, child care and groceries—went missing. *See, e.g.,* Receivership Dkts. 48, 55, 64, 68, 80, 91, 162, 234. To date, no one has been able to locate the whereabouts of the student money.

201.    The Receiver has been conducting an investigation into the whereabouts of the missing student money, as well as into the payment of bonuses prior to the Receivership and the potentially fraudulent transfers of at least $1.5 million to DCF, but to date no information has been released. On May 20, 2019, the Receivership Court ordered the Receiver to report on the results of his investigation prior to termination of the Receivership. Receivership Dkt. 336 at 3.

**Plaintiffs' Claims Have Been Confirmed By The Administrator of a Consent Judgment Between DCEH and 40 State Attorneys General**

202.    In November 2015, EDMC entered into Consent Judgments with forty state attorneys general in order to resolve consumer protection claims arising out of unfair and deceptive recruitment and enrollment practices at its for-profit educational institutions. The terms and conditions of the Consent Judgment are binding on DCEH.

203.    Pursuant to the Consent Judgment, Thomas J. Perrelli was jointly appointed by EDMC and the Attorneys General as Settlement Administrator to oversee compliance with the Consent Judgment. The Consent Judgment provides that "[i]f at any time it appears that [DCEH]

37

is engaged in a practice or pattern of non-compliance, or commits an egregious act of non-compliance," the Administrator shall "work in conjunction with [DCEH] to devise a corrective action plan."

204.    In late 2018, Mr. Perrelli issued his third annual report ("Third Report"), which covers the period from October 1, 2017 – September 30, 2018 and contains numerous findings of misconduct by DCEH.  The Third Report is attached hereto as Exhibit 5.

205.    The Third Report confirms the allegations set forth in this Complaint. Specifically, in the Third Report Mr. Perrelli found that, contrary to HLC policy, "DCEH did not inform Illinois Institute of Art or Art Institute of Colorado students or prospective students that it had lost its accreditation.  Instead, DCEH revised the accreditation statement on its website to expressly claim that the schools 'remain accredited as a candidate school.'"  Third Report at 44.

206.    Mr. Perrelli explained that this decision carried "significant consequences" for students, which "became more dramatic once DCEH announced in July that those schools would close – and thus that many of the students would *need* those credits to transfer to other schools." *Id.* at 43 (emphasis in original).

207.    Mr. Perrelli found that the revised accreditation statement was "inaccurate and misleading" and ordered DCEH to complete a  "corrective action plan" that "fully remed[ies] the harms" caused by its failure to advise students that their school lost accreditation. The completion of such a corrective action plan was "a necessary prerequisite to being in substantial compliance with the Consent Judgment."  *Id.* at 44, 62.

208.    On February 26, 2019, Mr. Perrelli moved to intervene in the Receivership out of a concern "that the Receiver is not complying or will not comply with the Consent Judgments, and most immediately with a requirement that . . . DCEH must refund moneys to over a thousand

students who may have been deceived by misleading statements by DCEH regarding the accreditation status of two of its schools. . . .To date, the Receiver has not indicated his intent to comply with the Consent Judgments." Receivership Dkt. 77-1 at 1-2. Mr. Perrelli's motion to intervene was granted. Receivership Dkt. 144.

209.    In his motion, Mr. Perrelli explained that "DCEH acknowledged the violation and ultimately agreed to correct the misstatements, and the Administrator has been working with DCEH on the details of a Corrective Action Plan to provide relief to the students who were misled." Receivership Dkt. 77-1 at 9. To date, no such relief has been provided.

210.    On March 22, 2019, Mr. Perrelli further informed the court in the Receivership that the misrepresentations regarding accreditation are an "an egregious act of non-compliance" pursuant to ¶116(a) of the Consent Judgment and that the necessary Corrective Action Plan could be fulfilled by the Receiver returning to students funds that DCEH acquired using fraudulent representations. Receivership Dkt. 199 at 4-5.

211.    Mr. Perrelli explained that those funds "need not be treated as part of any eventual bankruptcy estate; by operation of law, they belong in a constructive trust. . . . Clearly, funds that DCEH acquired by defrauding students into believing that they were paying for credits from an accredited school are not funds that DCEH ought to hold and enjoy." Receivership Dkt. 199 at 4-5.

212.    In addition to the findings about accreditation, the Third Report found that DCEH leadership, led by Mr. Richardson, was finalizing plans to profit personally off of DCEH students by funneling them into a for-profit educational entity that they controlled called Woz U. When DCEH compliance staff raised questions about the Woz U arrangement, Mr. Richardson stated that compliance "is the place where everything goes to die. Understand this. I run DCEH. I

run Woz U. You don't question this." Third Report at 22. Mr. Perrelli ultimately concluded that, "in promoting Woz U, DCEH provided or endorsed misleading and non-compliant information to prospective students." Receivership Dkt. 77-1 at 7. DCEH abandoned the Woz U partnership shortly after it launched.

213. Mr. Perrelli also found that after DCEH compliance personnel sought to activate a range of disclosures and warnings to students required by ED's Gainful Employment regulation, 34 C.F.R. § 668.401 *et seq.*, "they were overruled by DCEH management, who acknowledged the disclosure requirement but told the compliance personnel expressly that they could not activate the failure warnings because the warnings would deter new students from enrolling." Third Report at 29; *see also* Receivership Dkt. 77-1 at 8 ("Interviews with DCEH employees revealed that this decision was made deliberately in order to avoid disclosing poor gainful employment numbers to prospective students.").

214. The Receiver has stipulated that:

    a. Accreditation is essential for students to transfer credits to other schools and for potential employers to recognize degrees.

    b. It is not true that IIA and the Art Institute of Colorado "remain[ed] accredited" following HLC's January 20, 2018 action.

    c. IIA and Art Institute of Colorado students were not informed that their schools lost accreditation until June 2018.

    d. DCEH recognizes the need for restitution for the approximately 1,494 students impacted during the time period when the accreditation status was not disclosed. Receivership Dkt. 323-1.

## CLASS ACTION ALLEGATIONS

215.    Named Plaintiffs bring this action on behalf of themselves and a class of all similarly situated individuals pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3).

216.    Had Defendants followed HLC's directive and informed Named Plaintiffs in January 2018 that their "courses or degrees are not accredited by HLC and may not be accepted in transfer to other colleges and universities or recognized by prospective employers," Named Plaintiffs would have investigated options for continuing their education at an accredited school, rather than continuing to pay tuition and incur debt for unaccredited courses at IIA.

217.    Named Plaintiffs request that this Court certify a class of "all persons who were first enrolled or remained enrolled at IIA-Chicago and/or IIA-Schaumburg on or any time after January 20, 2018, including students who were enrolled prior to January 20, 2018 and remained enrolled after that date, as well as students who first enrolled on or after that date."

**Numerosity**

218.    The potential number of class members are so numerous that joinder would be impracticable.

219.    While the precise number of students enrolled at IIA on or after January 20, 2018 is known only to Defendants, there are well over 1,000 such students.  *See* College Scorecard, U.S. Dep't of Educ., *available at:*

https://collegescorecard.ed.gov/search/?name=illinois%20institute%20of%20art%20&sort=salary:desc.

220.    The precise number of class members can easily be determined through discovery.

**Commonality and Predominance**

221.    The nature of the relief sought is common to all members of the class and common questions of law and fact exist as to all members of the class.  These common questions of law and fact predominate over any questions affecting individual members of the class.

222.    All members of the class have been subject to and affected by a uniform course of conduct in that all class members were enrolled at IIA during the period in which Defendants' unlawful conduct was ongoing.

223.    These common legal and factual questions arise from Defendants' misrepresentations to, and concealments from, the entire IIA student body regarding the status of its accreditation starting on January 20, 2018.

224.    As alleged herein, these representations were widely disseminated on the school's website, in course catalogues and course catalogue addendums published online and available to all students, in enrollment agreements, and in emails to the student body, among other places.

225.    The common questions of law and fact include, but are not limited to:

a.    Whether Defendants misrepresented to students that IIA was an accredited institution on or after January 20, 2018;

b.    Whether, after January 20, 2018, Defendants failed to inform IIA students that IIA was no longer an accredited institution;

c.    Whether Defendants intended that IIA students rely upon the concealment, suppression, or omission of the fact that IIA was not an accredited institution;

d.    Whether Defendants' misrepresentations regarding IIA's accreditation constitute a deceptive act or practice under the ICFDPA;

e. Whether Defendants' omissions regarding IIA's accreditation constitute a deceptive act or practice under the ICFDPA;

f. Whether Defendants' conduct is unfair under the ICFDPA such that it offends public policy; is immoral, unethical oppressive or unscrupulous; or causes substantial injury to consumers; *and*

g. Whether Defendants owe a duty to students to refrain from providing false and misleading information.

**Typicality**

226. Named Plaintiffs' claims are typical of the claims of the class members.

227. Named Plaintiffs and class members' claims are based on the same legal and factual theories, in that:

a. Defendants' misrepresentations and omissions have caused significant damage to all students who have taken out student loans or paid out of pocket to attend IIA since January 20, 2018.

b. Named Plaintiffs and the class all enrolled in the same school and were subject to and affected by the same unlawful course of conduct during the same time period.

**Adequacy**

228. Named Plaintiffs are adequate representatives of, and will fairly and adequately protect the interests of, the putative class because their interests in the vindication of the legal claims that they raise are entirely aligned with the interests of the other putative class members, who each have the same state law claims. Named Plaintiffs are members of the putative class

and their interests coincide with, and are not antagonistic to, those of the other putative class members.

229.    Named Plaintiffs are represented by counsel who are experienced in litigating complex consumer protection cases and class action matters in both state and federal courts and who have extensive knowledge on issues of higher education law, consumer protection, and student debt.

230.    The interests of the members of the putative class will be fairly and adequately protected by the Named Plaintiffs and their attorneys.

**Superiority**

231.    A class action is superior for the fair and efficient adjudication of this matter, in that:

> a.  Defendants have acted in the same unlawful manner with respect to all class members.
>
> b.  A legal ruling concerning the unlawfulness of Defendants' representations and omissions since January 20, 2018 would vindicate the rights of every class member.
>
> c.  Due to the numerous members of the class and the existence of common questions of fact and law, a class action will serve the economies of time, effort, and expense as well as prevent possible inconsistent results. Litigating individual lawsuits in the present case would be a waste of judicial resources and addressing the common issues in one action would aid judicial administration.

**FACTUAL ALLEGATIONS CONCERNING NAMED PLAINTIFFS**

**Emmanuel Dunagan**

232.   Emmanuel Dunagan is 26 years old and has lived in Bellwood, IL at all times relevant to this complaint.

233.   In December 2014, Mr. Dunagan was accepted into IIA-Chicago's illustration and design bachelor's degree program, which he started in January 2015.  Mr. Dunagan remained enrolled at IIA-Chicago from January 2015 until he graduated in December 2018.

234.   Mr. Dunagan did not learn that IIA-Chicago had lost its accreditation on January 20, 2018 until he returned to school for summer classes on or around July 9, 2018 and attended meetings with President Ramey.

235.   At the time Mr. Dunagan learned that IIA-Chicago was not accredited, all that remained for him to complete his degree was an internship.

236.   Mr. Dunagan investigated whether Columbia College would accept the credits that he earned at IIA-Chicago.  Columbia College informed Mr. Dunagan that he would need to attend for approximately two additional years in order to obtain the same degree that he would obtain if he remained at IIA-Chicago through December 2018.

237.   Mr. Dunagan chose to remain enrolled at IIA, as Mr. Crowley had recommended, and completed his degree in December 2018.

238.   Defendants' conduct has severely diminished the value of Mr. Dunagan's IIA education and degree.

239.   Mr. Dunagan's official IIA-Chicago transcript contains an addendum with the following disclaimer: "Effective January 20, 2018[,] The Illinois Institute of Art located in Chicago, Illinois has transitioned to being a candidate for accreditation after previously being

accredited. Institute courses completed or degrees earned during the candidacy period are not accredited by HLC."

240. Defendants' conduct has caused serious damage to Mr. Dunagan. For 2018 alone, DCEH estimated the IIA-Chicago cost of attendance to be $28,878 (living with parents) and $32,644 (living off campus).

241. Had Defendants followed HLC's directive and informed him in January 2018 that his "courses or degrees are not accredited by HLC and may not be accepted in transfer to other colleges and universities or recognized by prospective employers," Mr. Dunagan would have investigated options for continuing his education at an accredited school, rather than continuing to pay tuition and incur debt for unaccredited courses at IIA.

**Jessica Muscari**

242. Jessica Muscari is 30 years old and has lived in Wheaton, IL at all times relevant to this complaint.

243. In April 2015, Ms. Muscari enrolled in IIA-Chicago's illustration and design bachelor's degree program. Ms. Muscari remained enrolled at IIA-Chicago from April 2015 until she graduated in September 2018.

244. Ms. Muscari did not learn that IIA-Chicago had lost its accreditation on January 20, 2018 until she returned to school for summer classes on or around July 10, 2018.

245. When Ms. Muscari learned that IIA-Chicago had not been accredited since January 20, 2018, she needed two credits to graduate.

246. Nearly finished with her program, Ms. Muscari decided to remain enrolled at IIA-Chicago, as Mr. Crowley had recommended. Ms. Muscari graduated from IIA-Chicago in

September 2018 and received high honors. Because she graduated while IIA-Chicago was not accredited, her diploma reflects graduation from an unaccredited institution.

247. Defendants' conduct has severely diminished the value of Ms. Muscari's IIA education and degree.

248. In addition, Ms. Muscari's official IIA-Chicago transcript contains an addendum with the following disclaimer: "Effective January 20, 2018[,] The Illinois Institute of Art located in Chicago, Illinois has transitioned to being a candidate for accreditation after previously being accredited. Institute courses completed or degrees earned during the candidacy period are not accredited by HLC."

249. Defendants' conduct has caused serious damage to Ms. Muscari. For 2018 alone, DCEH estimated the IIA-Chicago cost of attendance to be $28,878 (living with parents) and $32,644 (living off campus).

250. Had Defendants followed HLC's directive and informed Ms. Muscari in January 2018 that her "courses or degrees are not accredited by HLC and may not be accepted in transfer to other colleges and universities or recognized by prospective employers," she would have investigated options for continuing her education at an accredited school, rather than continuing to pay tuition and incur debt for unaccredited courses at IIA.

**Robert J. Infusino**

251. Robert J. Infusino is 22 years old and has lived in Addison, IL at all times relevant to this complaint.

252. Mr. Infusino enrolled in IIA-Schaumburg's audio production bachelor's degree program in October 2015. Mr. Infusino remained enrolled at IIA-Schaumburg until he withdrew from the program on September 4, 2018.

253.     Mr. Infusino did not learn that IIA-Schaumburg lost its accreditation on January 20, 2018 until on or around July 5, 2018, when he was first made aware of the June 20 email sent while he was on break, as well as newspaper articles about the loss of accreditation.

254.     Upon returning to school on or around July 9, 2018, Mr. Infusino asked IIA-Schaumburg's financial aid office if he could get a refund for his unaccredited classes.  He was told that the school was not issuing refunds.

255.     Mr. Infusino also met with the registrar's office to ask for additional information and receive guidance about his options.  The registrar did not have any additional information beyond what was communicated to students via email.

256.     At the time Mr. Infusino learned that IIA-Schaumburg was not accredited, he was scheduled to graduate in June 2019.

257.     Upon learning that IIA-Schaumburg had not been accredited since January 20, 2018, Mr. Infusino did not immediately know what to do.  In order to keep making progress toward his degree, he remained enrolled in the school while he considered his options.

258.     Mr. Infusino ultimately withdrew from IIA-Schaumburg on September 4, 2018.

259.     Defendants' conduct has severely diminished the value of Mr. Infusino's IIA education.

260.     Mr. Infusino's official IIA transcript contains an addendum with the following disclaimer: "Effective January 20, 2018[,] The Illinois Institute of Art located in [Schaumburg], Illinois has transitioned to being a candidate for accreditation after previously being accredited. Institute courses completed or degrees earned during the candidacy period are not accredited by HLC."

261.    Defendants' conduct has caused serious damage to Mr. Infusino.  For 2018 alone, DCEH estimated the IIA-Schaumburg cost of attendance to be $28,878 (living with parents) and $32,644 (living off campus).

262.    Had Defendants followed HLC's directive and informed Mr. Infusino in January 2018 that his "courses or degrees are not accredited by HLC and may not be accepted in transfer to other colleges and universities or recognized by prospective employers," he would have investigated options for continuing his education at an accredited school, rather than continuing to pay tuition and incur debt for unaccredited courses at IIA.

**Stephanie Porreca**

263.    Stephanie Porreca is 28 years old and has lived in Wood Dale, IL at all times relevant to this complaint.

264.    In July 2014, Ms. Porreca enrolled in IIA-Schaumburg's digital photography bachelor's degree program.  Ms. Porreca remained enrolled at IIA-Schaumburg from July 2014 until she graduated in June 2018.

265.    From January 20, 2018 until she graduated on June 16, 2018, Ms. Porreca was unaware that IIA-Schaumburg had lost its accreditation.

266.    Ms. Porreca, along with numerous family members, attended her graduation ceremony on June 18, 2018.  At no time during the graduation did Defendants mention that students were receiving diplomas from an unaccredited institution.

267.    On June 20, 2018, just two days after her graduation ceremony, Ms. Porreca received an email from President Ray stating that the school was not accredited.  This was the first time she learned that her school was not accredited.

268.    The June 20, 2018 email did not disclose to Ms. Porreca that IIA-Schaumburg lost accreditation five months prior.

269.    Ms. Porreca ultimately learned that IIA-Schaumburg lost accreditation in January 2018 when she was made aware, on or around July 8, 2018, of the June 19 *Pittsburgh Post-Gazette* article.

270.    Ms. Porreca was stunned to learn that, because she had graduated while IIA-Schaumburg was not accredited, her diploma reflected graduation from an unaccredited institution.

271.    Defendants' conduct has severely diminished the value of Ms. Porreca's IIA education and degree.

272.    Ms. Porreca's official IIA transcript contains an addendum with the following disclaimer: "Effective January 20, 2018[,] The Illinois Institute of Art located in [Schaumburg], Illinois has transitioned to being a candidate for accreditation after previously being accredited. Institute courses completed or degrees earned during the candidacy period are not accredited by HLC."

273.    Defendants' conduct has caused serious damage to Ms. Porreca. For 2018 alone, DCEH estimated the IIA-Schaumburg cost of attendance to be $28,878 (living with parents) and $32,644 (living off campus).

274.    Had Defendants followed HLC's directive and informed Ms. Porreca in January 2018 that her "courses or degrees are not accredited by HLC and may not be accepted in transfer to other colleges and universities or recognized by prospective employers," she would have investigated options for continuing her education at an accredited school, rather than continuing to pay tuition and incur debt for unaccredited courses at IIA.

## COUNT I
### Deceptive Practices Under the ICFDPA – Misrepresentations of Material Fact
### (All Defendants)

275.     Plaintiffs repeat the allegations in the foregoing paragraphs and incorporate them as though fully set forth herein.

276.     The ICFDPA makes it unlawful to employ:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce.

815 ILCS 505/2.

277.     As set forth above, Defendants engaged in a course of trade or commerce that constitutes deceptive acts or practices declared unlawful under Section 2 of the ICFDPA, 815 ILCS 505/2.

278.     These deceptive acts or practices include, but are not limited to, misrepresentations to Named Plaintiffs and the class that IIA "remain[ed] accredited" by HLC after January 20, 2018.

279.     These misrepresentations were contained in widely distributed materials received and reviewed by Named Plaintiffs and the class, including in course catalogues, course catalogue addendums, enrollment agreements entered into on or after January 20, 2018, and the IIA-Chicago and IIA-Schaumburg websites.

280.     These deceptive acts or practices also include, but are not limited to, misrepresentations to Named Plaintiffs and the class that IIA was likely to reobtain accreditation and, when it did, all credits earned during the period of candidacy would reflect such accreditation.

281.    Defendants intended for Named Plaintiffs and the class to rely upon these misrepresentations.

282.    Defendants' violations took place repeatedly over the course of at least five months and were designed to mislead and deceive students regarding material facts about IIA.

283.    As a result of Defendants' conduct, Named Plaintiffs and the class have suffered, and will continue to suffer, actual harm in the form of debt incurred in order to attend IIA, costs incurred to attend IIA, lost wages, damage to credit, loss of eligibility for financial aid programs, and a diminution in the value of their degrees, among other harms.

284.    Defendants have therefore violated the ICFDPA, 815 ILCS 505/2, and Named Plaintiffs and the class have been damaged in an amount to be determined by the trier of fact.

## COUNT II
### Deceptive Practices Under the ICFDPA – Omissions of Material Fact
### (All Defendants)

285.    Plaintiffs repeat the allegations in the foregoing paragraphs and incorporate them as though fully set forth herein.

286.    The ICFDPA makes it unlawful to employ:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce.

815 ILCS  505/2.

287.    As set forth above, Defendants have engaged in a course of trade or commerce that constitutes deceptive acts or practices declared unlawful under Section 2 of the ICFDPA, 815 ILCS 505/2.

288.    The deceptive acts or practices include, but are not limited to, the failure to disclose to Named Plaintiffs and the class that IIA lost accreditation on January 20, 2018.

289.    Defendants' violations took place repeatedly over the course of at least five months and were designed to conceal, suppress, and omit material facts regarding IIA's accreditation from Named Plaintiffs and the class.

290.    For the five month period starting on January 20, 2018, DCF could have, but did not, publicly disclose the truth about IIA's accreditation.

291.    Defendants also chose not to appeal HLC's accreditation decision until after it had decided to close IIA, allowing them to avoid revealing that they were appealing a loss of accreditation that they had concealed from the students.

292.    If Defendants had disclosed the loss of accreditation following completion of the sale to DCF, students would have elected to leave IIA rather than take unaccredited courses, which would have exacerbated the financial exposure to DCF and DCEH from the EDMC acquisition and jeopardized the numerous other synergies and benefits of the acquisition for DCF and its Dream Center Network, which DCF had been publicly touting since March of 2017.

293.    DCF's calculated silence was a critical component Defendants' efforts to misrepresent and conceal the true nature of IIA's accreditation to students.

294.    DCF provided knowing, substantial assistance to the other Defendants in the coordinated effort to wrongfully conceal, for a period of approximately five months, that IIA lost its status as an accredited institution of higher education, causing substantial harm to Named Plaintiffs and the class.

295.    As a result of Defendants' conduct, Named Plaintiffs and the class have suffered, and will continue to suffer, actual harm in the form of debt incurred in order to attend IIA, costs

incurred to attend IIA, lost wages, damage to credit, loss of eligibility for financial aid programs, and a diminution in the value of their degrees, among other harms.

296.     Defendants have therefore violated the ICFDPA, 815 ILCS 505/2, and Named Plaintiffs and the class have been damaged in an amount to be determined by the trier of fact.

## COUNT III
## Unfairness Under the ICFDPA
### (All Defendants)

297.     Plaintiffs repeat the allegations in the foregoing paragraphs and incorporate them as though fully set forth herein.

298.     To determine whether conduct is unfair, Illinois courts consider whether the practice offends public policy; is immoral, unethical, oppressive or unscrupulous; or causes substantial injury to customers.

299.     A practice offends public policy when it violates a standard of conduct contained in an existing statute, regulation, or common law doctrine that typically applies to such a situation.

300.     The Higher Education Act and its implementing regulations contain a public policy against false, erroneous, or misleading statements—known as "substantial misrepresentations"—about the nature and extent of an institution's accreditation. *See, e.g.,* 34 C.F.R § 668.71, 668.72(a). A substantial misrepresentation includes "any statement that omits information in such a way as to make the statement false, erroneous, or misleading." 81 Fed. Reg. 76072.

301.     The Illinois Administrative Code also contains a public policy against false, erroneous, or misleading statements to students and the public regarding, among other things,

"material facts concerning the institution and the program or course of instruction" that are "likely to affect the decision of the student to enroll." Ill. Adm. Code tit. 23 § 1030.60(a)(7).

302.    In addition, pursuant to HLC policy, an institution must "portray[] clearly and accurately to the public its accreditation status with national, specialized, and professional accreditation agencies as well as with the Higher Learning Commission, including a clear distinction between Candidate or Accredited status and an intention to seek status." *See* HLC Policy CRRT.A.10.010(7).

303.    Through their misrepresentations and omissions regarding the nature and extent of IIA's institutional accreditation, Defendants are therefore in violation of the public policy reflected in the regulations implementing the Higher Education Act, the Illinois Administrative Code, and HLC policy.

304.    Defendants' misrepresentations and omissions regarding the nature and extent of IIA's accreditation therefore offend public policy and are unfair under the ICFDPA.

305.    Defendants' misrepresentations and omissions are also immoral, unethical, and oppressive under the ICFDPA.

306.    Because Defendants concealed the loss of accreditation from Named Plaintiffs and the class and affirmatively misrepresented that IIA "remain[ed] accredited," Named Plaintiffs and the class had no reason to know or suspect that their credits were unaccredited.

307.    Once they learned in June or July 2018 that IIA had lost accreditation in January 2018, there was no remedy by which they could obtain accreditation for their previous course work.

308.    Defendants' misconduct also caused substantial injury to consumers.  As explained by HLC, credits earned by students during the candidacy period "may not be accepted in transfer to other colleges and universities or recognized by prospective employers."

309.    Not only were Named Plaintiffs harmed by Defendants' conduct, but so too were all students enrolled at IIA campuses from January 20, 2018 to the present.  Upon information and belief, Defendants DCEH, DCF, and John Does 1-10 engaged in the exact same misrepresentations and omissions at the Art Institute of Colorado and Art Institute of Michigan, which were likewise placed on candidacy status by HLC on January 20, 2018.

310.    Defendants' conduct therefore had the potential to and did cause substantial injury to large numbers of consumers.

### COUNT IV
### Negligent Misrepresentation
### (Corporate Defendants)

311.    Plaintiffs repeat the allegations in the foregoing paragraphs and incorporate them as though fully set forth herein.

312.    Defendants, as the providers of educational services, represented that IIA was an accredited institution of higher education when, in fact, IIA had not been accredited since January 20, 2018.

313.    Defendants also represented that if IIA re-obtained HLC accreditation, all credits earned during the period of candidacy would be deemed accredited.

314.    At the time of these representations, Defendants knew or should have known that they were false.  Alternatively, Defendants made them without knowledge of their truth or veracity.

315.    Defendants owed Named Plaintiffs and the class a duty to refrain from providing false and misleading information.

316.    Defendants also had a duty when touting the numerous benefits to students of the change of control from EDMC to DCF to also disclose the negative consequences of the change of control, namely, the loss of accreditation.

317.    Defendants breached that duty by misrepresenting and omitting material facts about IIA's accreditation status to Named Plaintiffs and the class.

318.    These negligent misrepresentations, upon which Named Plaintiffs and class members reasonably and justifiably relied, were intended to, and actually did induce, Named Plaintiffs and the class to remain enrolled at IIA.

319.    Had Defendants followed HLC's directive and informed Named Plaintiffs and the class in January 2018 that their "courses or degrees are not accredited by HLC and may not be accepted in transfer to other colleges and universities or recognized by prospective employers," they would have investigated options for continuing their education at an accredited school, rather than continuing to pay tuition and incur debt for unaccredited courses at IIA.

320.    Defendant's negligent misrepresentation caused damage to Named Plaintiffs and the class, who are entitled to damages and other legal and equitable relief.

## COUNT V
### Fraudulent Concealment
### (Corporate Defendants)

321.    Plaintiffs repeat the allegations in the foregoing paragraphs and incorporate them as though fully set forth herein.

322.    For over five months, Defendants concealed from Named Plaintiffs and the class that IIA had lost its status as an accredited institution on January 20, 2018.

323.     Defendants also chose not to appeal HLC's accreditation decision until after it had decided to close IIA, allowing them to avoid revealing that they were appealing a loss of accreditation that they had concealed from the students.

324.     This information was material to students in deciding whether to enroll and remain enrolled at IIA.  As HLC explained in its January 20, 2018 statement: "Students taking classes or graduating during the candidacy period should know that their courses or degrees are not accredited by HLC and may not be accepted in transfer to other colleges and universities or recognized by prospective employers."

325.     Whether courses or degrees are accredited and "accepted in transfer to other colleges and universities or recognized by prospective employers" is highly material to students' decision to enroll and remain enrolled in an institution of higher education.

326.     Defendants had a duty to inform Named Plaintiffs and the class about IIA's loss of accreditation, as well as a duty to not make false or misleading statements concerning the nature and extent of IIA's institutional accreditation.

327.     HLC's January 20, 2018 statement "require[ed] that the Institutes provide proper advisement and accommodations to students in light of this action, which may include, if necessary, assisting students with financial accommodations or transfer arrangements if requested."

328.     In addition, under Department regulations, an institution of higher education receiving federal funds under Title IV of the Higher Education Act is prohibited from making substantial misrepresentations or omissions "about the nature of its educational program, its financial charges, or the employability of its graduates."  34 C.F.R. § 668.71.

329.    A misrepresentation concerning "the nature of an eligible institution's educational program" explicitly includes, but is not limited to "false, erroneous or misleading statements concerning - (a) The particular type(s), specific source(s), nature and extent of its institutional, programmatic, or specialized accreditation." 34 C.F.R. § 668.72(a).

330.    The Illinois Administrative Code also requires Defendants to "accurately describe" all "material facts concerning the institution and the program or course of instruction as are likely to affect the decision of the student to enroll."  Ill. Adm. Code tit. 23 § 1030.60(a)(7) (2012).

331.    Similarly, HLC policy requires an institution to "portray[] clearly and accurately to the public its accreditation status with national, specialized, and professional accreditation agencies as well as with the Higher Learning Commission, including a clear distinction between Candidate or Accredited status and an intention to seek status."  *See* HLC Policy CRRT.A.10.010 (7).

332.    By concealing the loss of accreditation, Defendants intended to induce a false belief that there had been no material change to the school's accreditation status and, by extension, no material change to how prospective employers and other institutions of higher education would value IIA credits.

333.     For the five month period starting on January 20, 2018, DCF could have, but did not, publicly disclose the truth about IIA's accreditation.

334.    If Defendants had disclosed the loss of accreditation following completion of the sale to DCF, students would have elected to leave IIA rather than take unaccredited courses, which would have exacerbated the financial exposure to DCF and DCEH from the EDMC

acquisition and jeopardized the numerous other synergies and benefits of the acquisition for DCF and its Dream Center Network, which DCF had been publicly touting since March of 2017.

335. DCF's calculated silence was a critical component Defendants' efforts to misrepresent and conceal the true nature of IIA's accreditation to students.

336. DCF provided knowing, substantial assistance to the other Defendants in the coordinated effort to wrongfully conceal, for a period of approximately five months, that IIA lost its status as an accredited institution of higher education, causing substantial harm to Named Plaintiffs and the class.

337. Due to Defendants' fraudulent concealment, as well as Defendants' affirmative representations that IIA "remain[ed] accredited," Named Plaintiffs and the class had no reason to seek out alternative sources of information regarding IIA's accreditation status.

338. Named Plaintiffs and the class justifiably relied upon Defendants' silence as a representation that there had been no material change to their school's accreditation status and, by extension, no material change to how prospective employers and other institutions of higher education would value their credits and degrees.

339. Had Defendants followed HLC's directive and informed Named Plaintiffs and the class in January 2018 that their "courses or degrees are not accredited by HLC and may not be accepted in transfer to other colleges and universities or recognized by prospective employers," they would have investigated options for continuing their education at an accredited school, rather than continuing to pay tuition and incur debt for unaccredited courses at IIA.

340. As a result of Defendants' conduct, Named Plaintiffs and the class have suffered, and will continue to suffer, actual harm in the form of debt incurred in order to attend IIA, costs

incurred to attend IIA, lost wages, damage to credit, loss of eligibility for financial aid programs, and a diminution in the value of their degrees, among other harms.

## **REQUESTED RELIEF**

WHEREFORE, Named Plaintiffs individually, and on behalf of the putative class, respectfully request that this Court enter judgment in their favor and grant the following relief after a trial on the merits:

(1) Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the class as defined herein;

(2) Designating Named Plaintiffs as representatives of the class and the undersigned as class counsel;

(3) Entering judgment in favor of Named Plaintiffs and the class and against Defendants;

(4) Awarding Named Plaintiffs and the class actual damages in an amount to be proven at trial;

(5) Awarding Named Plaintiffs and the class punitive damages;

(6) Finding that all student funds that Defendants acquired using fraudulent representations regarding accreditation be held in a constructive trust for Named Plaintiffs and the class;

(7) Awarding Named Plaintiffs and the class reasonable attorney's fees and costs under the ICFDPA; *and*

(8) Granting all such further and other relief as the Court deems just and appropriate.


Respectfully Submitted,

/s/ Daniel A. Edelman

Daniel A. Edelman
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com
Atty. No. 41106 (Cook)


Alexander S. Elson*
Eric Rothschild *
NATIONAL STUDENT LEGAL DEFENSE NETWORK
1015 15th Street NW, Suite 600
Washington D.C. 20005
alex@nsldn.org
eric@nsldn.org
www.nsldn.org
* Pro Hac Vice motions pending

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on July 19, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system, which sent notification of such filing to all CM/ECF participants..

/s/ Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com
Atty. No. 41106 (Cook)