## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| EMMANUEL DUNAGAN, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:19-cv-00809 |
| ILLINOIS INSTITUTE OF ART CHICAGO, LLC, *et al.*, | Hon. Charles R. Norgle |
| Defendants. | |
| DREAM CENTER FOUNDATION, | |
| Defendant / Third-Party Plaintiff | |
| v. | |
| HIGHER LEARNING COMMISSION | |
| Third-Party Defendant | |

## ORDER

Third-Party Defendant Higher Learning Commission's motion to dismiss [94] is granted. All claims against Third-Party Defendant Higher Learning Commission are dismissed with prejudice.

## MEMORANDUM OPINION

Former students of the Illinois Institute of Art ("Art Institute") brought this class action against the Art Institute and its owners, Dream Center Foundation and Dream Center Educational Holdings, LLC ("Dream Center") and its agents because Defendants allegedly misinformed students as to the school's accreditation status for several months in 2018. Because the students were unaware that the school had lost its accreditation, they paid tuition and took out student loans only to later learn that their course work was not officially recognized by other colleges and many

employers. The Dream Center filed a third-party complaint against the accreditation agency, the Higher Learning Commission (the "Commission"), for contribution claiming that if Dream Center is found liable, the Commission should share in that liability because it allegedly failed to "provide clear, complete, accurate and unambiguous accreditation information." The Commission moved to dismiss the third-party complaint against it, arguing that, as a matter of law, the Commission cannot be held liable for contribution. This Court agrees with the Commission and dismisses all the claims against it, with prejudice, for the reasons set forth below.

## **Background**

The Art Institute was an educational institution offering degrees in numerous programs in the arts, including design, fashion, media, and culinary arts. The Art Institute had been in operation for over a hundred years until its recent closure. About a year before its closure, the Art Institute was purchased by the Dream Center from its then-owner, the Education Management Corporation. That sale ultimately closed on January 19, 2018. Until then, the Art Institute had maintained accreditation by the Commission. Leading up to the sale, the Commission investigated the proposed change in ownership of the Art Institute that would result from the contemplated sale, which included numerous site visits and consultations with the Art Institute and the Dream Center.

On November 16, 2017, the Commission sent a letter to the Defendants approving the proposed sale but notified Defendants that "this approval is subject to the requirement Change of Control Candidacy Status . . . [the] requirements [of which] are outlined below." Dkt. 48-2 at 11. Plaintiffs allege that this letter informed the Defendants that proceeding with the sale would result in the Art Institute losing its accreditation. Dream Center alleges that the letter was so confusing that it could not ascertain from it the Art Institute's imminent loss of accreditation. See Dkt. 92 ¶¶28-38.

2

The letter reads that the Commission "found that the Institutes did not demonstrate that the five approval factors were met without issue, as outlined in its findings below, but found that the Institutes demonstrated sufficient compliance with the Eligibility Requirements to be considered for preaccreditation status . . . ." Dkt. 94-2. The letter placed the schools in a status known as "Change of Control Candidacy." While in this status, the letter outlines the conditions and information needed to ultimately satisfy the Commission's eligibility requirements for accreditation and the Commission's review process. If "the institutions are able to demonstrate to the satisfaction of the Board that they meet the Eligibility Requirements, Criteria for Accreditation and Assumed Practices without concerns, the Board shall reinstate accreditation . . . ." Id. at 14 (emphasis added). The Defendants accepted these conditions and proceeded to the closing of the sale. Dkt. 48 ¶100.

Plaintiffs allege that on January 12, 2018, prior to the sale, the Commission issued a written announcement that the Art Institutes would go "from 'Accredited' to 'Candidate'," and explained that the "period of Change of Control-Candidacy status lasts from a minimum of six months to a maximum of four years [during which] an institution is not accredited but holds a recognized status with [the Commission] indicating the institution meets the standards for candidacy." Dkt. 48 at 19. (emphasis added). The Commission further stated that "[s]tudents taking classes or graduating during the candidacy period should know that their courses or degrees are not accredited by [the Commission] and may not be accepted in transfer to other colleges and universities or recognized by prospective employers. Institute courses completed and degrees earning prior to this January 20, 2018, change of status remain accredited." Id. The Commission instructed the Art Institute to "provide proper advisement and accommodations to students in light of this action, which may

include, if necessary, assisting students with financial accommodations or transfer arrangements if requested." Id.

The sale of the Art Instituted closed on January 19, 2018. Dkt. 92 ¶39. The next day, the Commission published a statement "on its website stating that the institutions were no longer accredited and that credits and credentials earned by students were not accredited and might not be accepted on transfer to other institutions." Id. The Dream Center alleges that prior to this communication, the Commission "had never revoked nor suspended the accreditation of [the Art Institute] or advised [the Art Institute] of its right to appeal any adverse action." Id. ¶40. The Dream Center claims that "this was the first time [the Commission] ever mentioned [the Art Institute] losing its accreditation," and that it was "completely shocked and blindsided that [the Commission] made the decision to change the accreditation status of [the Art Institute], given that [the Commission] had approved the sale of these institutions to [the Dream Center]." Dkt. 96 at 8. The Dream Center alleges that after this disclosure, it "began to send letters and emails to [the Commission] over the next several months, pointing out that the Disclosure was inconsistent with the Approval Letter and requesting that it be revised." Dkt. 92 ¶42. The Commission filed a similar disclosure a month later, continuing to note that the Art Institute was not accredited. Dkt. 48-2 at 24.

Plaintiffs allege that between January 20, 2018 and June 19, 2018, Defendants knew about the Art Institute's loss of accreditation, but did not tell their students. The Plaintiffs allege that Defendants intentionally hid the Art Institute's accreditation status, lied about it, and continued to actively recruit and enroll new students—all of whom were unaware of the schools' loss of accreditation.

4

Plaintiffs allege that the Defendants sent email communications to the students on January 23 and 24, 2018, informing them that the sale closed without any mention of the loss of accreditation. Dkt. 48 ¶¶116-22. Plaintiffs allege that a month later, Defendants published a "catalog addendum" to the school's course catalog titled "Accreditation update." That addendum reads, "[t]he Illinois Institute of Art is in transition during a change of ownership. We remain accredited as a candidate school seeking accreditation under new ownership and our new non-profit status." Id. ¶122. Defendants continued to publish this statement in their subsequent course catalogs. With respect to new students, Plaintiffs further allege that the Defendants' enrollment agreements stated that "[w]e remain accredited as a candidate school seeking accreditation under new ownership and our new nonprofit status." Id. ¶137.

Plaintiffs allege that emails show that Defendants "made a calculated decision not to promptly appeal or otherwise challenge [the Commission's] decision," and that Defendants were aware that the Dream Center had "told the students of the [Art Institute] that the schools remain accredited but [the Commission] on its website says they do not." Id. ¶128. Further, Plaintiffs allege that an email from a school administrator asks "why appeal if we are going to close these schools[?]" Id. ¶131.

Plaintiffs allege that the Defendants maintained the lie into June of 2018—after many students had already graduated being entirely unaware that their degrees were unaccredited. Id. ¶132. Plaintiffs allege that the Defendants finally informed students in late June 2018 only after media reports surfaced exposing their misconduct. The school shut down in December 2018, and Plaintiffs allege that over $16 million in federal student loan stipend money went missing. Id. ¶200.

The uproar over the allegations against the Dream Center caused a congressional investigation, a Department of Education inquiry, and investigative reporting by the New York Times into the matter. See Dkt. 48-2; Erica L. Green and Stacy Cowley, Emails Show DeVos Aides Pulled Strings for Failing For-Profit Colleges, N.Y. TIMES (Jul. 23, 2019) available at https://www.nytimes.com/2019/07/23/us/politics/dream-center.html.[1] Plaintiff students filed their complaint with this Court on behalf of a purported class, bringing claims against the Art Institute and the Dream Center for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and for common law fraudulent concealment and negligent misrepresentation. The Dream Center brought a third-party complaint against the Commission, alleging that the Commission should share in any liability from the students' allegations against it because the Commission allegedly did not "provide clear, complete, accurate and unambiguous accreditation information." The Commission has moved to dismiss that complaint, which this Court grants for the reasons set forth below.

## Standard

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint contain a "short and plain statement of the claim showing that the plaintiff is entitled to relief." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 554-557 (2007). This statement must provide sufficient plausible facts to put a defendant on notice of the claims against him. Brooks v. Ross, 578 F. 3d 574, 581 (7th Cir. 2009). The complaint "must provide enough factual information to 'state a claim to relief that is plausible on its face' and 'raise a right to relief above a speculative level.'" Doe v. Village of Arlington Heights, 782 F.3d 911, 914 (7th Cir. 2015) (quoting Twombly, 550 U.S. at 555, 570). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

---

[1] Facts asserted in these publications are not considered or assumed true for the purposes of this ruling on a motion to dismiss.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citations and quotation marks omitted). In reviewing a plaintiff's claim, the court "must construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor." Virnich v. Vorwald, 664 F.3d 206, 212 (7th Cir. 2011). However, the facts pleaded in the complaint must form a legally cognizable claim to survive a motion to dismiss. Fifth Third Bank v. Hirsch, No. 10 C 5484, 2011 WL 2470643, at *2 (N.D. Ill. June 20, 2011).

Further, as the Dream Center correctly points out, this Court may consider documents attached to Dream Center's third-party complaint, documents that are critical to the third-party complaint or referred to in it, and additional facts set forth in Dream Center's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." Mercola v. Abdou, 223 F. Supp. 3d 720, 725 (N.D. Ill. 2016); Chicago Faucet Shoppe, Inc. v. Nestle Waters N. Am. Inc., 24 F. Supp. 3d 750, 755 (N.D. Ill. 2014).

This action is before the Court on diversity jurisdiction, bringing claims under the Illinois Contribution Act. Illinois law applies to the substance of the claims Dream Center has brought against the Commission.

I.    **The Commission does not owe a tort duty to the students of the Art Institute, and thus cannot be held liable for contribution.**

The Dream Center brings contribution claims against the Commission under 740 ILCS 100/2(a), alleging that the Commission is responsible for the claims brought against the Dream Center by the Plaintiffs. The Dream Center did not bring any direct claims against the Commission. Under 740 ILCS 100/2(a), "where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of

7

contribution among them. . . ." 740 ILCS 100/2(a). Under Illinois law, a claim against a third party for contribution must be rooted in tort liability to the original plaintiff(s), and not necessarily to the original defendant. Vroegh v. J & M Forklift, 165 Ill. 2d 523, 529, 651 N.E.2d 121, 125 (1995). "If a defendant is not a tortfeasor vis-a-vis the original plaintiff, it cannot be a joint tortfeasor vis-a-vis a codefendant and may not be held liable to that codefendant for contribution." Id.; Hartford Fire Insurance Company v. Adobo Limited Partnership, 2020 IL App (1st) 192422-U, ¶ 36, 2020 WL 7682544, at *7. If the third-party plaintiff cannot establish that the third-party defendant owed a tort duty to the original plaintiff, a claim for contribution must fail as a matter of law. It is appropriate for this Court to address the existence of a tort duty on a motion to dismiss because "[w]hether a duty is owed presents a question of law, while breach of duty and proximate cause present questions of fact." Hasbun v. United States, 941 F. Supp. 2d 1011, 1015 (N.D. Ill. 2013). The Commission argues that the Dream Center's third-party complaint against it must be dismissed because, as an independent accreditation entity, it does not owe any tort duty to the Plaintiff students.

As a threshold matter, the parties disagree whether the Dream Center's third-party complaint seeks contribution based on (1) the Commission's alleged improper withdrawal of the Art Institute's accreditation, or (2) the Commission's alleged incomplete or unclear statements concerning the Art Institute's accreditation. See Dkt. 96 at 12. ("[The Commission's] argument fails because [the Commission]'s liability is not based on the withdrawal or grant of accreditation, but rather the misleading statements [the Commission] made regarding ILIA schools' accreditation status both before and after the DCEH acquisition at issue."). The Court finds that the Dream Center's complaint seeks contribution for both because, according to the Dream Center's complaint, the Commission allegedly rendered "a decision to withdraw [the Art Institute's]

8

accreditation that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and because the Commission allegedly failed "to correctly and completely communicate to parties submitting change in ownership applications and [Art Institute] students that Change of Control-Candidacy status means the [Art Institute] would lose its accreditation only because of the ownership transfer." Dkt. 92 at 24-25. However, Dream Center cannot state a legally cognizable claim under either set of allegations. This Court addresses each in turn.

### A. The Commission did not owe a tort duty to the plaintiff students for its allegedly improper decision to withdraw the Art Institute's accreditation.

The Dream Center's complaint claims that the Commission's decision to remove the Art Institute's accreditation was "unreasonable and unjustified," "arbitrary, capricious, an abuse of discretion," and was "reached without observance of procedure required by law," and contrary to the Commission's own published rules. Dkt. 92 ¶¶9, 10, 41. The Commission argues that no court has ever held that an independent accreditation agency has a tort duty to students, and the courts that have addressed this issue have dismissed the cases before them.

The Commission is correct. Courts have repeatedly declined to impose a tort duty to students on accreditors with respect to their accreditation decisions. Ambrose v. New Eng. Ass'n of Sch. & Coll., Inc., 252 F.3d 488 (1st Cir. 2001); Keams v. Tempe Technical Inst., Inc., 110 F.3d 44 (9th Cir. 1997); Gabriel v. Albany Coll. of Pharmacy & Health Sciences – Vermont Campus, No. 2:12-CV-14, 2013 WL 4456690, at *8-9 (D. Vt. Aug. 16, 2013). The parties have not identified, nor has this Court located, any case in which an independent accreditor was held to have a tort duty to students based on an accreditation decision. To be clear, there are cases in which the educational institution brought direct claims against accreditors for the arbitrary denial of accreditation on procedural grounds. Ambrose v. New Eng. Ass'n of Sch. & Coll., Inc., 252 F.3d 488 (1st Cir. 2001) (collecting cases). But "none of these cases involves either a claim of negligent

9

accreditation or a claim by a person who is not a party to the accreditation process" Id. There are strong public policy concerns that "that militate against endowing ill-served students of accredited schools with a means to challenge the decisions of accrediting agencies." Id. Here, neither the Dream Center nor the Art Institute brought claims against the Commission for the arbitrary denial of accreditation. Rather, the Dream Center brought claims for contribution, which requires this Court to determine whether the underlying Plaintiffs, the students, have a legally cognizable claim in tort against the Commission for improperly withdrawing the Art Institute's accreditation. They do not. Ambrose v. New Eng. Ass'n of Sch. & Coll., Inc., 252 F.3d 488 (1st Cir. 2001); Keams v. Tempe Technical Inst., Inc., 110 F.3d 44 (9th Cir. 1997); Gabriel v. Albany Coll. of Pharmacy & Health Sciences – Vermont Campus, No. 2:12-CV-14, 2013 WL 4456690, at *8-9 (D. Vt. Aug. 16, 2013). Thus, Dream Center's contribution claims alleging the improper withdrawal of accreditation must be dismissed.

**B. The Commission did not owe a tort duty to the plaintiff students to more vigorously inform Dream Center of the impending withdrawal of accreditation.**

Perhaps in recognition that it could not sustain a contribution claim based on the Commission's withdrawal of accreditation, the Dream Center in its response brief argued that the Commission's "liability is not based on the withdrawal or grant of accreditation, but rather the misleading statements [the Commission] made regarding ILIA schools' accreditation status. . ." See Dkt. 96 at 12. The Commission argues that it has no tort duty to the students at all, including with respect to its communications before sale of the Art Institute to the Dream Center.

The parties have attached or referenced several communications to their respective pleadings, on which the Court is entitled to rely to adjudicate a motion to dismiss. Mercola v. Abdou, 223 F. Supp. 3d 720, 725 (N.D. Ill. 2016); Chicago Faucet Shoppe, Inc. v. Nestle Waters N. Am. Inc., 24 F. Supp. 3d 750, 755 (N.D. Ill. 2014). The Commission communicated with the

Art Institute before and after the sale closed on January 19, 2018. The Dream Center complains that the Commission's pre-closing communications were "misleading," with respect to the forthcoming accreditation status, and that it was only on January 20, 2018, a day after the sale closed, that the Dream Center first found out about the accreditation decision. The Dream Center claims it was "shocked and blindsided that [the Commission] made the decision to change the accreditation status of [the Art Institute], given that [the Commission] had approved the sale of these institutions to [the Dream Center]." Dkt. 96 at 8. There were two pre-closing communications at issue attached to and referenced in the parties' complaints.

First, on November 7, 2018, the Commission sent a letter to the Defendants approving of the proposed sale, but notified the Defendant's that "this approval is subject to the requirement Change of Control Candidacy Status" and that if the schools complied with the process outlined in the letter, "the Board shall reinstate accreditation . . ." Dkt. 94-2 at 14. Second, Plaintiffs allege that on January 12, 2018, the Commission sent Defendants a letter that reads in part that the Art Institute's upcoming change in status meant that it would not be "accredited but holds a recognized status with [the Commission] indicating the institution meets the standards for candidacy." Dkt. 48 at 19. Dream Center admits that it received the first communication, but disputes receiving the second before the sale on January 19, 2018. Thus, the Court will consider the first communication and declines to consider the second at this time.

In general, this Court declines to go so far as to preclude any potential tort duty for an accreditor's communication of its accreditation decisions, or lack thereof. Here, however, this Court holds that the Commission had no tort duty to the students to further or better communicate its accreditation decision to the Art Institute. The same reasoning in Kearns, Gabriel, and Ambrose applies here because the claim at issue is whether the Commission owed the students a duty to

11

communicate something more to the Art Institute above and beyond telling the Art Institute that
the sale was subject to a change in the school's status, and that the school could subsequently work
to "reinstate accreditation." But there are no allegations that the students received that
communication, or somehow relied on it to their detriment. Thus, in addition to the policy
concerns outlined in Ambrose advising against permitting students or other third parties to bring
such a claim, the allegations here do not involve communications to the students, or lack thereof.

The Dream Center's response argues that a tort duty can be found under Section 552 of the
Restatement of Torts, which states:

> One who, in the course of his business, profession or employment,
> or in any other transaction in which he has a pecuniary interest,
> supplies false information for the guidance of others in their
> business transactions, is subject to liability for pecuniary loss caused
> to them by their justifiable reliance upon the information, if he fails
> to exercise reasonable care or competence in obtaining or
> communicating the information.

Restatement (Second) of Torts § 552 (1977). First, Section 552 was at issue in Keams, and the
court nonetheless held that the students could not bring a claim against the accreditor under it.
Keams v. Tempe Technical Inst., Inc., 110 F.3d 44, 46 (9th Circ. 1997). Second, Section 552
requires that a purported tortfeasor supply "false information" to the plaintiff. The Dream Center
makes no factual allegation that any statement in any of the Commission's communications was
false.[2] Rather, the Dream Center's primary contention is that the November 16, 2017 letter was
confusing, incomplete, and unclear because "the real meaning and impact of the letter was hidden"
and the letter did not "warn [Defendants] and their students that [the Commission]'s position was
going to be that courses or degrees taken during the candidacy period were not accredited by the
[the Commission]." Dkt. 92 at ¶¶29-30. But a failure to disclose and a failure to warn are different

---

[2] The complaint makes conclusory allegations that the Commission's communications were "inaccurate" and
"incorrect" without explaining how or alleging any facts with respect to their alleged falsity.

than the communication of a false statement. Without an alleged false statement, Section 552 of the Restatement of Torts is inapplicable and does not support the conclusion that the Commission somehow had a duty to the students to communicate more with the Defendants.

Finally, when determining whether a tort duty exists under Illinois law, courts look to four factors familiar to any law student: "(1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing the burden on the defendant. Swearingen v. Momentive Specialty Chemicals, Inc., 662 F.3d 969, 972 (7th Cir. 2011). None of these factors support imposing a duty on the Commission here. The injury alleged in Plaintiffs' complaint is not the Art Institute's loss of accreditation itself; it is the students enrollment in and payment for unaccredited classes without knowing that the classes were unaccredited. See Dkt. 48 ¶216 ("Had Defendants followed HLC's directive and informed Named Plaintiffs in January 2018 that their 'courses or degrees are not accredited . . . Named Plaintiffs would have investigated options for continuing their education at an accredited school, rather than continuing to pay tuition and incur debt for unaccredited courses at [the Art Institute].") In other words, Plaintiffs were not allegedly hurt because their school lost accreditation but because their school subsequently lied and misled them about its accreditation status, robbing them of the opportunity to transfer to an accredited school. These are distinct injuries which drastically impact the analysis concerning the existence of a tort duty.

It is foreseeable to an accreditor that a school's sudden loss of accreditation could cause a headache for students, sending them scrambling to transfer to an accredited institution. It is not foreseeable, however, to an accreditor that a school that recently lost its accreditation would refuse to disclose that information to students, lie about its accreditation status in its promotional materials, and continue to recruit new students using misstatements about its accreditation status.

13

Although the Dream Center makes much of the sufficiency of the Commission's pre-closing communications, the Dream Center admits that it knew that the Commission withdrew accreditation on January 20, 2018, which was the same date that the withdrawal of accreditation became effective. Dkt. 92, ¶39; Dkt. 96 at 8. Plaintiffs' allegations run from that date forward, alleging that the Defendants intentionally withheld that information from the students and lied about its accreditation status for months. See Dkt. 48 ¶154. This conduct is highly unforeseeable, highly unusual, and potentially criminal. See United States v. Ross, 77 F.3d 1525 (7th Cir. 1996). Placing the burden on the Commission to foresee and prevent this kind of misconduct is misplaced. Thus, this Court holds that under the alleged circumstances, the Commission does not have a tort duty to the students.[3]

## II. Dream Center's contribution claims for Counts I-III and V of Plaintiffs' complaint are not cognizable because the underlying claims allege intentional misconduct.

Even if the Commission had a tort duty to the students, the Dream Center cannot seek contribution for Counts I-III and V of Plaintiffs' complaint because those claims allege intentional misconduct. "Illinois law . . . does not provide for a right to contribution for intentional tortfeasors." Forsythe v. Polsky, No. 90 C 7302, 1993 WL 69600, at *7 (N.D. Ill. Mar. 11, 1993); Appley v. West, 929 F.2d 1176, 1180 (7th Cir. 1991); Hollinger Int'l, Inc. v. Hollinger, Inc., No. 04 C 0698, 2006 WL 1444916, at *4 (N.D. Ill. Jan. 25, 2006) ("[A] defendant may not seek contribution from a joint tortfeasor predicated upon a breach of fiduciary duty or any intentional tort.") There are five counts in Plaintiffs' complaint. Counts I-III are claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), alleging that

---

[3] This Court does not go as far to conclude that students could never have a negligence claim against the Commission for faulty communications concerning a school's accreditation status. Had the Commission never informed the Defendants, Plaintiff students, or the public of its decision to withdraw accreditation or had attempted to apply a accreditation withdrawal retroactively, the imposition of a tort duty on an accreditor might have some merit.

Defendants made repeated misrepresentations designed to mislead and deceive students and Defendants intentionally failed to disclose (as well as actively concealed) the school's true accreditation status. Count V is a common law fraudulent concealment claim with similar allegations. The Dream Center argues that courts have permitted contribution claims under the Consumer Fraud Act under certain circumstances because innocent misrepresentations can be actionable under the statute, and thus claims under the Consumer Fraud Act do not qualify as intentional torts. But plaintiffs did not bring claims under the Consumer Fraud Act for innocent misrepresentations. The Plaintiffs complaint for Counts I-III and V is replete with allegations of Defendants' intentional misconduct. Even though a party can bring claims for innocent misrepresentations under the Consumer Fraud Act, the Plaintiffs have not done so here. Further, claims under the Consumer Fraud Act, even if they plead innocent misrepresentations, still require that the defendant intend to cause the plaintiff to rely on the misrepresentation. Elder v. Coronet Ins. Co., 201 Ill. App. 3d 733, 752 (1990). Either way, Plaintiffs' claims in Counts I-III and Count V are best characterized as intentional torts. Because Counts I-III and Count V of Plaintiffs' complaint allege intentional misconduct, contribution for those claims is precluded under Illinois law and must be dismissed.

III. **Dream Center's contribution claim for Count IV is not cognizable because the Dream Center does not allege a misstatement.**

Count IV of the Plaintiffs' complaint is for negligent misrepresentation, and is the only Count that is not an intentional tort. However, as suggested in its name, a claim for negligent misrepresentation requires an allegation of a false statement. Turubchuk v. E.T. Simonds Constr. Co., No. 12-CV-594-SMY-SCW, 2017 WL 480738, at *6 (S.D. Ill. Feb. 3, 2017); Paulsen v. Abbott Lab'ys, No. 15-CV-4144, 2018 WL 1508532, at *18 (N.D. Ill. Mar. 27, 2018). Plaintiffs allege that Dream Center and the other Defendants made false statements concerning its

15

accreditation status after January 20, 2018. The Dream Center's contribution claim on Count IV, however, does not allege that the Commission made a false statement or somehow caused the Dream Center to make false statements to its students after the Dream Center was fully aware that the Art Institute had lost accreditation. Thus, even though Count IV of Plaintiffs' complaint is not an intentional tort, the Dream Center's contribution claim on it must fail.

In sum, multiple, independent grounds support dismissal of Dream Center's complaint against the Commission. This Court hereby dismisses the Dream Center's third-party complaint in its entirety and with prejudice.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE:  March 30, 2021

16